**In re INITIATIVE PETITION NO. 347
STATE QUESTION NO. 639.**

**No. 76109.**

Supreme Court of Oklahoma.

June 11, 1991.

Rehearing Denied July 9, 1991.

B.J. Brockett, Anthony L. Jackson, J. Mark Spaeth, Oklahoma City, Stanley M. Ward, Norman, Duchess Bartmess, Oklahoma City, Gary L. Giessmann, Norman, for Proponents S.T.O.P. New Taxes.

D. Kent Meyers, Gayle L. Barrett, Roger A. Stong, Robert E. Bacharach, Crowe & Dunlevy, Oklahoma City, for Protestant Elizabeth Parker.

Thomas Dee Frasier, Frasier & Frasier, Laura Emily Frossard, Gary Dean Allison, James C. Thomas, Tulsa, for Protestants George A. Singer and Jason Brimer.

Michael Minnis, David McCullough, Michael Minnis & Associates, P.C., Oklahoma City, for amicus curiae.

HARGRAVE, Justice.

Three major determinations are before the Court for resolution in this proceeding in reference to Initiative Petition No. 347. Protestants have filed objections to the count of signatures on the petition and objections to the legal sufficiency or validity. Lastly, the Court has been presented with an objection to the proposed ballot title.

Protests have been filed and briefed by two law firms representing three individuals. George A. Singer and Jason Brimer present one set of arguments while Elizabeth Parker presents another set of briefs. Proponents, S.T.O.P. New Taxes, resist the arguments presented by the two groups of protestants.

## I.

### LEGAL SUFFICIENCY

We first consider objections to the legal sufficiency of the proposed State Question No. 639. Summarized, these objections are as follows: The petition is invalid on its face because it seeks only to repeal House Bill 1017 and that power is not included in the reserved power of the initiative; the petition is facially invalid because it seeks to repeal comprehensive appropriation and tax legislation; the petition is invalid because it is deceptively worded, seriously misleading and not readily understandable.

Invalidity of the petition is also urged upon the basis that the petition contains multiple subjects. It is alleged that the gist of the proposal is deceptive and misleading both as a result of the language used and the omissions in that language. It is further alleged that § 5 of the petition prefers one religion over another and is therefore unconstitutional. Unconstitutionality is also premised upon the fact that the petition denies teachers due process of law in regard to nonrenewal of their contracts and additionally impairs the obligation of contract with respect to teachers.

Finally, the protestant alleges that the petition does not include the full text of the proposed measure as required by Art. V § 2 of the Oklahoma Constitution.

## A.

### ISSUES RAISED BY PROTESTANTS SINGER AND BRIMER

■ The challenge by protestants Singer and Brimer to the legal sufficiency of Initiative Petition No. 347 on the basis that it seeks to repeal House Bill 1017 must fail. It is proposed here that repeal of a law is not one of the powers reserved to the people by initiative. Doubtless the petition does seek to repeal the House Bill, but that is only ancillary to the main purpose of restoring the State's taxation and education statutes to the position obtaining prior to the passage of that bill. There can be no dispute that as a referendum petition this state question would be invalid as is fully illustrated by *In re Referendum Petition No. 1*, 203 Okl. 298, 220 P.2d 454, at p. 459 (1950), wherein the following language is found:

... In effect it [the power of referendum] gives the people the right, upon a petition by a specific number of qualified electors, to withdraw from the legislature the power to finally enact legislation in certain instances. Thereunder when the legislative body has proposed and adopted certain legislation not declared to be necessary for the immediate preservation of the public peace, health, or safety, and not making appropriations for the maintenance of state institutions, and not pertaining to the support of public schools, the people, upon a petition signed by the requisite number of electors, have the right to take away from the legislature the ultimate right to determine whether such legislation shall be adopted and to decide for themselves by their vote whether such proposed legislation should be adopted or rejected.

This subject would not be appropriately addressed by a referendum petition, but the fact is that this petition is not classified as a referendum petition by virtue of the

repeal provisions contained therein. In the case of *Wyatt v. Clark,* 299 P.2d 799, at p. 802 (Okl.1956), this Court was faced with the validity of a petition seeking only the repeal of Art. 12, §§ 1–13 of the charter of the city of Tulsa. Noting the petition was filed eight years after the charter provision was enacted, the Court stated that the situation there experienced was not a question of the power to repeal conflicting or overlapping laws, which is inherently a part of the power to enact new laws or amendments to old laws. In *Wyatt, supra,* the Court observed that the people have reserved unto themselves the power to repeal a law only by complying with procedural requirements and invoking the power of referendum *or* by making such a repeal an ancillary step in proposing a conflicting law or amendment under the power of the initiative. The example given in *Wyatt, supra,* states that confusion would ensue if the people of a community could repeal laws which establish the police department or other vital office without, at the same time, proposing some form of amendment to effect the performance of the duties placed upon those officers. This is exactly what has been done in regard to this petition—it has proposed laws and the repeal of laws to institute a different method of conducting education in this state than that which now obtains. It may be that some confusion could result from the adoption of this measure as protestants assert, but the simple repeal of state educational statutes which would classify this petition as a referendum petition is not the situation with which this Court is now faced. The wisdom of the proposed scheme is a legislative matter which would be decided in this instance by the people.

The protestants' second argument, in essence, that the petition is facially invalid because it seeks to repeal comprehensive appropriation and tax legislation is supported by citation to cases from other· jurisdictions and to the Oklahoma Constitution. This argument stands partially upon the premise that this petition seeks only a repeal of taxation provisions and this point has been shown above to be fallacious. If, as argued the petition sought the repeal of the power to tax it would indeed be void under Art. X § 5.[1] The purpose of this petition is, however, to repeal one taxation and school finance agenda and replace it with another. The protestants' contention that the petition runs afoul of the constitutional mandate of Art. X § 2 to the effect that the legislature must provide taxation sufficient to defray the ordinary expenses of government is not a mandate that any specific level of expense must be maintained.

This Court has stated in dicta that matters of revenue and taxation *MAY* be proper subjects for the exercise of the powers of initiative and referendum in *Quinn v. City of Tulsa,* 777 P.2d 1331, at p. 1339 (Okl.1989). Protestants refer us to *Citizens Against Mandatory Bussing v. Palmason,* 80 Wash.2d 445, 495 P.2d 657 (1972) for the proposition that initiative and referendum procedures cannot be used to interfere in the management of the state school system. In that case 495 P.2d at p. 661, the Washington court observed that the notion that administrative decisions of school district officers are subject to revision by referendum is a novel one in the law which would enable the voters of any community to impede the purpose of Art. IX § 1 of that state's constitution which provides it is the paramount duty of the state to provide ample provision for the education of all children residing within its borders. This case is scant authority for invalidating this petition for three reasons. One, this petition seeks to amend legislative not administrative action.[2] Two, the constitutional authority it is based upon is dissimilar to any provision in the *Oklahoma Constitution.* Three, the case is

---

1. The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class or subjects.

2. Similar to the Washington case our caselaw also provides that certain administrative functions of municipalities are not subject to the referendum process. *In re Referendum Petition No. 1968–1 of the City of Norman,* 475 P.2d 381 (Okl.1970); *Hughes v. Brian,* 425 P.2d 952 (Okl. 1967); *Brazell v. Zeigler,* 26 Okl. 826, 110 P. 1052 (1910).

inapplicable because it revolves around the question of a referendum petition.

 Protestants also make an argument that the repeal of House Bill 1017, an inte-

gral portion of the initiative petition, would contravene the prohibition against deficit financing found in Art X §§ 23 and 24.[3] The fallacy with this argument is that since

**3.** § 23 provides:

Not more than forty-five (45) days or less than thirty-five (35) days prior to the convening of each regular session of the Legislature, the State Board of Equalization shall make an itemized estimate of the revenues to be received by the state under the laws in effect at the time such estimate is made, for the next ensuing fiscal year, showing separately the revenues to accrue to the credit of the General Revenue Fund and each special fund of the state. The estimate shall not exceed an amount which shall be determined by the following procedure:

(1) Certify the total amount of revenue which accrued to the General Revenue Fund and each special fund during the last preceding fiscal year;

(2) Next, compute the percentage by which, in each one of the last five (5) preceding fiscal years, the amount of revenue exceeded, or was below, the corresponding amount of revenue for next preceding fiscal year, the average percentage of increase or decrease for this five-year period shall then be computed. Revenue of a nonrecurring nature shall be excluded from the revenue of the preceding fiscal years in computing the percentage of increase or decrease for those years;

(3) If there is a decline in the percentage of increase during the last preceding fiscal year as compared to the five-year average computed above, the Board shall compute such percentage for that period;

(4) The Board of Equalization, having computed the percentage based on (2) and on (3) above, shall then certify which is the lessor of the two methods;

(5) The Board shall then add to or subtract from the total amount of the revenue for the last preceding fiscal year a sum equal to twice the lesser of the two methods.

Such estimate shall be filed with the Governor, the President and President Pro Tempore of the Senate, and the Speaker of the House of Representatives. The Legislature shall not pass or enact any bill, act or measure making an appropriation of money for any purpose until such estimate is made and filed, unless the State Board of Equalization has failed to file said estimate at the time of convening of said Legislature, then, in such event, it shall be the duty of the Legislature to make such estimate pursuant to the provisions of this amendment, and all appropriations made in excess of such estimate shall be null and void; provided, however, that the Legislature may at any regular session or special session, called for that purpose, enact laws to provide for additional revenues or a reduction in revenues, other than ad valorem taxes, or transferring the existing revenues or unappropriated cash on hand from one fund to

another. Whereupon, it shall be the duty of the State Board of Equalization to make an estimate of the revenues that will accrue under such laws and to file the same with the Governor, with the President and President Pro Tempore of the Senate, and the Speaker of the House of Representatives, and the amount of any increase or decrease resulting, for any reason, from such laws shall be added to or deducted from each respective fund, as the case may be. The amount of such adjusted estimate shall be the maximum amount which can be appropriated for all purposes from any fund for the fiscal year estimated.

That portion of every appropriation, at the end of each fiscal year, in excess of actual revenues collected and allocated thereto, as hereinafter provided, shall be null and void. Revenues deposited in the State Treasury to the credit of the General Revenue Fund or of any special fund (which derives its revenue in whole or in part from state taxes or fees) shall, except as to principal and interest on the public debt, be allocated monthly to each department, institution, board, commission or special appropriation on a percentage basis, in that ratio that the total appropriation for such department, institution, board, commission or special appropriation from each fund for that fiscal year bears to the total of all appropriations from each fund for that fiscal year, and no warrant shall be issued in excess of said allocation. Any department, institution or agency of the state operating on revenues derived from any law or laws which allocate the revenues thereof to such department, institution or agency shall not incur obligations in excess of the unencumbered balance of cash on hand. The Legislature shall provide a method whereby appropriations shall be divided and set up on a monthly, quarterly or semi-annual basis within each fiscal year to prevent obligations being incurred in excess of the revenue to be collected, and notwithstanding other provisions of this Constitution, the Legislature shall provide that all appropriations shall be reduced to bring them within revenues actually collected, but all such reductions shall apply to each department, institution, board, commission or special appropriation made by the State Legislature in the ratio that its total appropriation for that fiscal year bears to the total of all appropriations for that fiscal year; provided, however, that the Governor may in his discretion issue a deficiency certificate or certificates to the State Auditor for the benefit of any department, institution or agency of the state, if the amount of such defficiency certificate or certificates be within the limit of the current appropriation for that department, institution or agency, whereupon the State Auditor shall issue warrants to the extent of such certifi-

this petition is not a referendum petition, the repeal of House Bill 1017 would be effective only upon its approval by the voters. Art. V § 3, Oklahoma Constitution. The debts incurred under the bill and the revenue raised by it would have been validly incurred and collected and expended during the time the bill was law.

■ Protestants Singer and Brimer finally argue that this petition should be declared invalid on its face because it is deceptively worded and is misleading to the point that its effects are concealed and not readily understandable. In the main, the argument proposes that the gist of the proposal led persons to believe that the initiative petition served only to repeal tax legislation, further causing the public to believe that House Bill 1017 did no more than increase, taxes, thereby ignoring the many aspects of the bill referrable to education reform. These changes are listed in the footnote.[4] The only citation of authori-

---

cate or certificates for the payment of such claims as may be authorized by the Governor, and such warrants shall become a part of the public debt and shall be paid out of any money appropriated by the Legislature and made lawfully available therefor; provided further, that in no event shall said deficiency certificate or certificates exceed in the aggregate the sum of Five Hundred Thousand Dollars ($500,000.00) in any fiscal year.
The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as provided in this amendment and in Sections 24 and 25 of this Article X of the Constitution of the State of Oklahoma.
§ 24 provides:
In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war; but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, or to repay such debts, and to no other purpose whatever.

4. 1. Initiation of a Voluntary Early Childhood Program—See H.B. 1017 § 16 [Appendix C, p. 18–19];
2. Encouragement of the Funding of new technology and innovation—See H.B. 1017 § 17 [Appendix C, p. 19]
3. Initiation of an Optional Extended School Year Program—See H.B. 1017 § 18 [Appendix C, p. 19–20]
4. Reforms to Oklahoma's Student Competency Testing Programs—See H.B. 1017 §§ 19–21 [Appendix C, p. 20–22]
5. The Establishment of the Oklahoma School Deregulation Committee and Study—See H.B. 1017 § 22 [Appendix C, p. 22]
6. Establishment of an Alternative Teaching Certification Program—See H.B. 1017 § 23 [Appendix C, p. 22–24]
7. The Abolition of the office of County Superintendent of Schools—See H.B. 1017 § 24 [Appendix C, p. 24]
8. Strengthening of the Qualifications, Training and Continuing Education Requirements of members of local boards of education—See H.B. 1017 §§ 25–27 [Appendix C, p. 24–26]
9. Reform of maximum class size limits—See H.B. 1017 §§ 28–31 [Appendix C, p. 26–31]
10. Changes in the definition of the school day for high school and kindergarten students—See H.B. 1017 § 32 [Appendix C, p. 31]
11. Mandates for more efficient uses of school property—See H.B. 1017 § 33 [Appendix C, p. 31–32]
12. Reforms encouraging more involvement between the schools, their staff and parents—See H.B. 1017 §§ 34–35 [Appendix C, p. 32–33]
13. The initiation of a program to make parents aware of their critical roles as teachers for very young children—See H.B. 1017 §§ 35, 37 [Appendix C, p. 32–33]
14. An initiative to help school districts adopt effective disciplinary methods other than corporal punishment—See H.B. 1017 § 38 [Appendix C, p. 33]
15. Broad application of new accreditation requirements to common schools other than the high schools—See H.B. 1017 § 39 [Appendix C, p. 33–34]
16. Changes improving the Qualifications of members of the State Board of Education and improving the geographic representation of members of the State Board of Education—See H.B. 1017 § 40 [Appendix C, p. 34]
17. Provisions assuring strict accountability for the implementation of education reform—See H.B. 1017 §§ 41–43 [Appendix C, p. 34–36]
18. Reforms and increases in the teacher compensation system, including the encouragement of differential and incentive pay plans—See H.B. 1017 §§ 44–50 [Appendix C, p. 36–43]
19. Strengthening the continuing education requirements for teachers and administrators—See H.B. 1017 § 51 [Appendix C, p. 44]
20. Reforming minority recruitment efforts—See H.B. 1017 § 52 [Appendix C, p. 44–45]
21. Vocational and Technological Education reforms—See H.B. 1017 § 53 [Appendix C, p. 45–46]
22. Initiation of an at-risk student model program study and implementation plan—See H.B. 1017 § 54 [Appendix C, p. 46]
23. Initiation of a leadership skills training program for administrators and teachers—See H.B. 1017 § 55 [Appendix C, p. 46]

ty accompanying this argument is a general reference to the presumption that statutory language was intended for some useful purpose and should be given effect. However this Court has recently stated the test for determining the sufficiency of the ballot title does not apply to the required statement on the petition. *In re Initiative Petition No. 341,* 796 P.2d 267 (Okl.1990). Title 34 O.S.Supp. 1985 § 3 sets out the requirements for the statement on the petition, and § 3 requires only a simple statement of the gist of the proposition. As the last cited authority explains at p. 274, "... The list of detailed requirements set out in section 9 for the ballot title, as opposed to section 3's general requirement for the Petition's statement, is further proof that the Legislature did not intend for the Petition's statement to be as particular as the ballot title."

### B.

### ISSUES RAISED BY PROTESTANT PARKER

Protestant Parker argues that this petition is invalid by virtue of Art. V § 57 of the Oklahoma Constitution which provides in part:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue

bills, and bills adopting a code, digest, or revision of statutes; ..."

Proponents state this is an issue that has not been decided in this jurisdiction. However the case of *In re Initiative Petition No. 191,* 201 Okl. 459, 207 P.2d 266 (1949), clearly foreshadows the solution of this question in that the Court syllabus expressly states that the clause immediately following the above quoted provision is applicable to the initiative process. Syllabus One of that case reads:

That part of Section 57, Art. 5 of the Constitution of the State of Oklahoma which provides: " * * * no law shall be revived, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, or extended or conferred shall be re-enacted and published at length: * * * " applies to measures proposed by initiative petitions as well as to acts of the Legislature.

While *In re Initiative Petition No. 191, supra,* 207 P.2d at p. 271 stated that the last quoted second clause is all embracive and applies to initiative as well as legislative measures, the case states that the second clause is "... entirely separable from the first clause." At p. 271. The first clause is more limited and states that it is applicable to "Every act of the legislature ..." The situation presented here revolves

24. Encouragement of local school districts to develop private/public partnerships for improving their facilities and programs—See H.B. 1017 § 56 [Appendix C, p. 46–47]
25. Mandating a review of teacher training standards for the 21st Century—See H.B. 1017 § 57 [Appendix C, p. 47–48]
26. Increasing the qualifications of certain principals—See H.B. 1017 § 58 [Appendix C, p. 48–49]
27. Mandating increased efficiency in delivering educational services by requiring coordination among the public common sdchools, the higher education system, and the Vocational and Technological education system—See H.B. 1017 § 59 [Appendix C, p. 49]
28. The Establishment of a Special Education Assistance Fund with which to help local school districts educate children with special needs—See H.B. 1017 §§ 61–64 [Appendix C, p. 50–51]
29. Initiation of a mandate to reduce administrative expenses—See H.B. 1017 § 65 [Appendix C, p. 51]

30. A prohibition against advancing students to higher grade levels unless they have achieved certain levels of competency—See H.B. 1017 § 66 [Appendix C, p. 51]
31. Changes in the student transfer decision making process—See H.B. 1017 §§ 89–91 [Appendix C, p. 63–64]
33. Changes to the transfer fee system—See H.B. 1017 § 92 [Appendix C, p. 64–65]
34. The Establishment of a special account within the general fund to which the new tax increase monies are to be credited and to be used only for supporting the education reforms of H.B. 1017—See H.B. 1017 § 98 [Appendix C, p. 72]
35. Revival of a prohibition against student transfers for purposes of achieving racial balance in the public schools which was repealed by H.B. 1017 and is probably unconstitutional—See Initiative § 78 [Appendix B, p. 73–74]

around a legislative act proposed by the people. *McAlister v. State ex rel. Walton,* 96 Okl. 143, 221 P. 779, at p. 782 (1923). As such the provisions of Art. V § 57 apply to this case and not those provisions dealing with revision of constitutional provisions found in Art. XXIV § 1 of the Constitution of Oklahoma.

Cases representative of the Art. XXIV § 1 analysis are: *In re Initiative Petition No. 344,* 797 P.2d 326 (Okl.1990), *In re Initiative Petition No. 342,* 797 P.2d 331 (Okl.1990) and *In re Initiative Petition No. 314,* 625 P.2d 595 (Okl.1981).

 Cases representative of Art. V § 57 analysis disclose in general an attempt to thwart inclusion of two entirely different subjects in one law. *Bond v. Phelps,* 200 Okl. 70, 191 P.2d 938 (1948). There is no need to express the details or subdivisions of legislation in the title. *Stewart v. Oklahoma Tax Commission,* 196 Okl. 675, 168 P.2d 125 (1946). The purpose of the requirement is to assure that every act shall embrace but a single subject so that the individual legislator and the people are put on notice as to the effect of the legislation. *Gibson Products Co. v. Murphy,* 186 Okl. 714, 100 P.2d 453 (1940), citing *Perry v. Carter,* 173 Okl. 267, 48 P.2d 278 (1935), this Court said in the *Gibson Products* case that it is not constitutionally required that the title should be so worded as to be a complete index to all the details of the act. The syllabus by the Court in *Gibson* holds that no elaborate statement of the subject of an act is necessary, provided matters considered in the text of the act are germaine to the title.

As protestant Parker notes the only title contained in Initiative Petition No. 347, State Question No. 639 is the ballot title. We disagree with protestant that it is a breathtaking assumption that the ballot title could serve as the title of the act as is required by Art. V § 57 of the Oklahoma Constitution. The requirement of this section is that the title of an act call attention to the general subject of the act. *Stewart v. Oklahoma Tax Commission, supra.* Although this section is mandatory, it should receive a reasonable construction so as to carry out its intent to prevent fraudulent and surreptitious legislation without unreasonably imperilling or annulling proper legislation. *Binion v. Oklahoma Gas & Electric Company,* 28 Okl. 356, 114 P. 1096 (1911). See also, *Ex parte Owen,* 143 Okl. 8, 286 P. 883 (1930). The ballot title serves in this instance as the title of the proposed act.

 Art. V § 57 of the Oklahoma Constitution requires every legislative act to have but one subject and that that subject be clearly expressed in its title. There is only one subject, we find, and it is clearly expressed in the title. That subject, as reflected in its title is the "... return [of] the laws regulating education and taxes to read as they did before the legislature passed and the Governor signed Enrolled House Bill 1017...." The remainder of the title goes into details which are actually unnecessary to meet the requirement of the above constitutional provision. The title of an act is not required to contain a summary, or abstract, of the provisions contained in it. It is only necessary that the contents of the act are referrable and cognate to the subject of the title to the act. *Stewart v. Oklahoma Tax Commission, supra.*[5] Stated differently it is sufficient if the contents of the bill are germaine to the subject expressed in the title. *Lowden v. Luther,* 190 Okl. 31, 120 P.2d 359 (1941). The *Lowden* decision presents a factual scenario analagous to the case at bar. There the act examined was titled "An Act relating to school districts ..." One provision of that act allowed the County Superintendent of Public Instruction and the Board of Commissioners to disorganize

---

5. *School Dist. No. 37, Washita County v. Latimer,* 190 Okl. 620, 126 P.2d 280 (1942); *Lowden v. Luther,* 190 Okl. 31, 120 P.2d 359 (1942); *Crawford v. Corporation Commission,* 188 Okl. 101, 106 P.2d 806 (1940); *Pure Oil Co. v. Oklahoma Tax Commission,* 179 Okl. 479, 66 P.2d 1097 (1937) appeal dismissed 58 S.Ct. 15, 302 U.S. 635, 82 L.Ed. 494; *Cooper v. King,* 171 Okl. 121, 42 P.2d 249 (1935); *Oklahoma City v. Grigsby,* 171 Okl. 23, 41 P.2d 697 (1935); *Ex parte Owen,* 143 Okl. 8, 286 P. 883 (1930); *State v. Wheatley,* 20 Okl.Cr. 28, 200 P. 1004 (1921); *Oklahoma City Land & Development Co. v. Hare,* 66 Okl. 190, 168 P. 407 (1917).

school districts and attach them to adjoining districts. This Court noted the first part of the title was very general and had the legislature stopped with that portion there would be no serious argument that the title was not broad enough to cover the disorganizing provision. The Court there noted that the abstracting of some provisions in the title would not destroy the effect of the general statement. The basis of the resolution of this question was that in construing the title of an act general expressions are not limited or restricted by subsequent specification of details or particulars. That is, the maxim expressio unius est exclusio alterius is not applicable when construing the effect of the title of an act. *Associated Industries of Oklahoma v. Industrial Welfare Commision*, 185 Okl. 177, at p. 185, 90 P.2d 899, at p. 909 (1939), *Pure Oil Company v. Oklahoma Tax Commission*, 179 Okl. 479, 66 P.2d 1097 (1937).

■ Protestant Parker next contends that the petition's statement of the gist of the petition is so misleading as to be deceptive and misleading. Title 34 O.S.Supp. 1989 § 3 requires: "... A simple statement of the gist of the proposition shall be printed on the top margin of each signature sheet...." Protestant contends *In re Initiative Petition No. 342, supra*, is on point and compels the conclusion that the gist of this petition is flawed. Such an objection is ineffective however. In the case cited for this point, the petition had been determined to contain five separate subjects. At p. 333 the Court noted "The statement on the Petition, as well as the ballot title, reflect only a few of the changes. The statement on the Petition does not contain the gist of the proposition as the ballot title does not explain the effect of the proposal." The reason that case does not demonstrate the invalidity of this petition is that, as noted in the previous quote, the purpose of the statement on the petition, as well as the ballot title is to "explain the effect of the proposal." This petition's statement fulfills that requirement, for it explains the *effect* of the proposal, and it explains the *total effect*, in that it states the purpose is the return of the laws regulating education and taxes to read as they did before 1017 became law. That is the sole purpose of this petition. In contrast, and for example, *In re Initiative Petition No. 342, supra*, the statement provided: the petition removes from the Constitution previous restrictions on business corporations. The statement did not indicate that the provision abrogating the fellow-servant doctrine was being removed from the Constitution. Art. IX § 36 of the Oklahoma Constitution abrogates the fellow-servant doctrine in more instances than simply where a business corporation is involved.[6] The doctrine is abrogated as to "every person, firm or corporation engaged in mining in this state." Without question the removal of the common law doctrine of fellow-servant is far broader than the statement on the petition or the ballot title. We find the rule repeated in *Oklahoma City v. Prieto*, 482 P.2d 919 (Okl.1971), to be applicable to this situation. As noted, this Court previously

---

**6.** The common law doctrine of the fellow-servant, so far as it affects the liability of the master for injuries to his servant, resulting from the acts or omissions of any other servant or servants of the common master, is abrogated as to every employee of every railroad company and every street railway company or inter-urban railway company, and of every person, firm, or corporation engaged in mining in this State; and every such employee shall have the same right to recover for every injury suffered by him for the acts or omissions of any other employee or employees of the common master that a servant would have if such acts or omissions were those of the master himself in the performance of a non-assignable duty; and when death, whether instantaneous or not, results to such employee from any injury for which he

could have recovered under the above provisions, had not death occurred, then his legal or personal representative, surviving consort or relatives, or any trustee, curator, committee or guardian of such consort or relatives, shall have the same rights and remedies with respect thereto, as if death had been caused by the negligence of the master. And every railroad company and every street railway company or inter-urban railway company, and every person, firm, or corporation engaged in underground mining in this State shall be liable under this section, for the acts of his or its receivers.

Nothing contained in this section shall restrict the power of the Legislature to extend to the employees of any person, firm, or corporation, the rights and remedies herein provided for.

stated the title to an act may be broader than its provisions but when the provisions of an act are broader than the title a fatal defect exists:

> The subject expressed in the title to an act fixes a limit upon the scope of the act, and all parts of an act which are not within its title are unconstitutional and void, even though such provisions might properly have been included in the act under a broader title.... *Oklahoma City v. Prieto, supra,* at 924.

This protestant contends that the gist does not tell the voters that the petition would make changes to Oklahoma tax laws. This is not the case. The gist of the proposition [7] states, inter alia, "... and will put back the language which was repealed regarding taxes and school law contained in House Bill 1017 which was the bill enacted by the legislature in April of 1990, ..." As a matter of literal truth the petition's § 41 amends § 1354 of Title 68 O.S.1981 so that it reads precisely as it did before 1017 was passed. After 1017 was passed however, Senate Bill 711 deleted § 1357(C) of Title 68 which exempted from sales tax carrier sales of newspapers and individual transactions on newspapers and periodicals which do not exceed $0.75.

At p. 14 of their brief protestant concedes that § 41 of the initiative petition changed § 1354 to read as it did prior to the effective date of 1017. Therefore, the pertinent inquiry is what is the effect of the legislature's action taken in Senate Bill 711 during the time the people of the state are considering an initiative petition on a related subject. That question has been answered in *Oklahoma Tax Commission v. Smith,* 610 P.2d 794 (Okl.1980) and *In re Referendum Petition No. 1, supra.*

The practical effect of the passage of this initiative petition would be to retain the nontaxable nature of newspapers and periodicals, by retaining the old 68 O.S.

§ 1357(C) with the judicial invalidation of a tax only on a portion of newspaper sales contained in *Dow Jones & Co. v. State ex rel Oklahoma Tax Commission,* 787 P.2d 843 (Okl.1990). However the Legislature deleted § 1357(C) in Senate Bill 711, Okl. Sess.Laws c.280 (approved with emergency clause effective May 25, 1990). The result of the Senate bill purports to remove the exemption invalidated by *Dow Jones & Co., supra,* which could be understood to tax all newspaper and periodical sales. However, the effect of Senate Bill 711 may directly change the essence of a question before the people in an initiative petition, which is not permitted as we have noted in *Oklahoma Tax Commission v. Smith, supra,* and *In re Referendum Petition No. 1, supra.*

■ If Senate Bill 711 is ultimately held to directly change the effect of a pending initiative petition *Oklahoma Tax Commission v. Smith, supra,* would be applicable. If not, that issue does not require this Court's present attention. Due to the indeterminate nature of this question at this time and in the light of the severability provisions in the initiative petition, judicial restraint is appropriately exercised in regard to this issue at this time. This conclusion is further supported by noting that the protestant's allegation that the petition does not inform voters that tax laws will be changed. As we have already noted such is not the case. Protestants argument on this premise does not require invalidation of the petition.

■ The protestant Parker objects to the validity of the petition on the additional ground that the statement does not inform voters of the changes the petition would make to the appropriation laws of Oklahoma. The argument contained on this point, however, differs from its title. It is alleged that the petition's passage would precipitate a revenue crisis in this state.

---

7. The gist of the proposition is as follows:
This measure will repeal the new language which increased taxes and changed some of the existing school law or created new school law and will put back the language which was repealed regarding taxes and school law contained in House Bill 1017 which was the bill

enacted by the Legislature in April of 1990, in a Special Session called by the Governor which began in August of 1989, commonly referred to as the "Education Reform and Tax Increase" bill.
A "YES" vote is a vote in favor of this measure.
A "NO" vote is a vote against this measure.

The brief states "Because no Oklahoma Legislature or proponent of an initiative petition has ever acted so irresponsibly as to slash revenues without also reducing appropriations, the precise effect of the petition cannot be meticulously described.... However it would plainly subject all appropriations ... to the anti-deficit provisions of Article X § 23 of the Oklahoma Constitution." Thus the protestant explains that passage of this initiative would provoke a revenue crisis. However such an argument provides no basis for judicial relief. This Court is not authorized to consider the desirability, wisdom or practicability of fiscal legislation as a working proposition since these questions belong to the legislative branch of government. *State ex rel. York v. Turpen*, 681 P.2d 763 (Okl.1984). Stated otherwise, whether an enactment is wise or unwise, whether it is based on sound economic theory or whether it is the best means to achieve the desired result are ordinarily matters for legislative determination. The earnest conflict of serious opinion does not bring it within the range of judicial cognizance. *Palmer Oil Corp. v. Phillips Petroleum Co.*, 204 Okl. 543, 231 P.2d 997 (1950), appeal dismissed 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022.

Parker argues three grounds that the petition is invalid which will be treated together, and these relate to the constitutionality of various provisions of the petition. Listed, these arguments are: (1) One provision violates the establishment clause by excusing Jewish children from school on Rosh Hashanah and Yom Kippur; (2) the due process rights of tenured teachers are violated by dismissal provisions; and (3) salary provisions of the petition violate the obligation of contract in reference to teachers. These allegations are not sufficient to defeat the submission of the initiative to the people of this state. The alleged fact that a portion of an initiative petition would violate the constitution does not render the petition invalid where the proposed law contains a severability provision and the questioned provisions could be eliminated without impairing the effect of the act. *In re Initiative Petition No. 191,*

*supra.* Section 81 of the initiative petition is a severability provision. Assuming, without deciding, the argument made by Parker is correct, these isolated infirmities would not invalidate the proposed statute in its entirety and surely should not be held to block the right of the people to pass legislation through the reserved power of the initiative. In *In re Initiative Petition No. 317,* 648 P.2d 1207, at p. 1219 (Okl. 1982), Doolin, J., concurring with five Justices, the Court was faced with a portion of a redistricting plan which was determined to be disruptive of the electoral process. The petition sought to implement a Congressional redistricting plan. The indefinite portion of the petition found to be objectionable related to effective dates of the proposed redistricting plan and the election held under it. The Court noted the infirmity would not invalidate the entire petition because § 7 contained a savings clause and the objectionable portion was not so inseparably connected with the petition that it could not be presumed the voters would not pass it without that portion. In the cause before the Court the questioned portions of this initiative are more incidental to the main thrust of the petition than in the last cited case and likewise would not invalidate the entire petition.

In the case of *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma No. 74–1 & 74–2,* 534 P.2d 3, at p. 8 (Okl.1975), this Court departed from the long held teaching of *Threadgill v. Cross*, 26 Okl. 403, 109 P. 558 (1910), and *Oklahomans for Modern Alcoholic Beverage Control v. Shelton*, 501 P.2d 1089 (Okl.1972). As a result this Court considered the constitutionality of an initiative petition before it became law. That action was reaffirmed in *In re Initiative Petition No. 315 etc.*, 649 P.2d 545 (Okl.1982). There we said if questions of constitutionality are raised as to subject matter procedure and form, those queries may be addressed and determined if the Court determines that such a resolution could prevent an expensive and unnecessary election. As noted in *In re Initiative Petition No. 315 etc.*, *supra*, this question

is answered through an examination of the severability of the provisions in question. If the provisions are not severable the questions are determinable prior to passage of the act by approval of the voters. The converse of this point is also true. Where the questioned provision is severable, and resolution of constitutional issues prior to the act becoming law would not prevent a costly and potentially unnecessary election, *Threadgill v. Cross, supra,* is still applicable and the questioned constitutionality is not ripe for determination since it presents nothing more than an abstract opinion on a hypothetical question.

■ Lastly, Parker asserts the petition is invalid by virtue of failure to include the full text of the measure proposed in violation of Article V § 2 of the Oklahoma Constitution. This argument is not grounded on the premise that the proposed law submitted by this petition does not actually contain the entire language of the proposed measure, in which case the objection would be persuasive. The argument is that by failing to mark the proposed measure as a legislative amendment would be marked in the usual course of legislation passed by the Oklahoma House and Senate, a violation of Article V § 2 has been established. The crux of this argument is that most of the proposed measure was so marked and the absence of those markings in fourteen instances is misleading and deceiving, violating the spirit of the constitutional provision.[8] Protestant admits there is no requirement that the initiative petition be so marked, and the objection is to the partial marking actually made. Similarly, there is no contention made that this petition attempts to formulate a new law without printing the full text of the act as required by Art. V § 2 of the Oklahoma Constitu-

tion, requiring the full text of the measure proposed to be included in the petition.

This argument must fail. There is no basis to hold the markings misleading. The petition does not explain the significance of the marking. Prior to Section 1 of the petition, this language appears: "Be it enacted by the people of the State of Oklahoma that the following law be adopted which shall read as follows:" The new law proposed is then printed. There is no assertion in the petition that new law is underlined, nor that language from the previously-enacted statutes carried into this act are not. It is similarly obvious that language marked through is not to be part of the act. In the absence of an assertion on the face of the petition that is contrary to its provisions it is not clear that the people will be misled by submission of this petition to the voters. The proposed law presented is the law that will become effective if enacted, and thus there is no basis to find the petition will mislead the voters.

## II.

### THE BALLOT TITLE

Pursuant to 34 O.S.Supp.1989 § 9(D) the Secretary of State's proposed ballot title was forwarded to the Attorney General for review. The Attorney General determined the proposed title not to be in legal form and in harmony with the law and he then prepared the following title in accordance with 34 O.S.Supp.1989 § 9(D)(3):

This measure replaces newly enacted House Bill 1017 with the laws existing before the Bill's passage. It repeals minimum standards for school accreditation and curriculum, but restores power to the State Board of Education to set those standards. It repeals certain programs for teacher training and certification, and

---

**8.** Art. V § 2, Okla.Const., provides:

The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and fifteen percentum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full text of the measure so proposed. The second power is the referendum, and it may be ordered (except

as to laws necessary for the immediate preservation of the public peace, health, or safety), either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted. The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of votes cast at the last general election for the State office receiving the highest number of votes at such election.

for parent education. It changes formulas for state assistance to consolidated schools and repeals severance pay for their employees. It raises the age for attending school from five to seven. It repeals the requirement to attend kindergarten. It restores student transfer fees and prior procedures for suspending or firing teachers. County Superintendent of Schools positions and the prior formula for school state aid are restored. Class size limits are raised and limits on how many students teachers may teach are removed. It repeals all taxes enacted to fund House Bill 1017. Teachers' minimum salaries are lowered. The measure repeals many other changes.

■ In accordance with 34 O.S.Supp. 1989 § 10, all parties objecting to the ballot title written by the Attorney General have offered a substitute ballot title for that proposed by the Attorney General. Where the title submitted by the Attorney General is found sufficient it is generally approved and utilized regardless of the sufficiency of those submitted by other parties. *Covey v. Williamson,* 265 P.2d 457 (Okl.1953).

This Court has stated the requirements of a ballot title that is in due form to be submitted to the electorate in *Arthur v. City of Stillwater,* 611 P.2d 637 (Okl.1980) and *Pierce v. Cartwright,* 638 P.2d 450 (Okl.1981). Therein we said that the ballot title must be in a form to permit the voter to reach an informed decision whether to approve or disapprove the measure. The question must be specific, but it is not required to contain the proposition from beginning to end. Sufficiency is shown where enough appears to identify the subject matter to reflect the character and purpose of the proposition. The question must not be deceptive or misleading and must be free of uncertainty and ambiguity. The test is whether or not the voters are afforded an opportunity to fairly express their will, and whether the question is significantly definite to apprise the voters with substantial accuracy upon that which they are voting. This language was again reviewed in *Matter of Proposed Ballot Title of State Question No. 319,* 685 P.2d 400 (Okl.1984). There the ballot title was ad-

dressed to the question of county option liquor by the drink. The appellant contended the proposed ballot title was infirm because it failed to mention sale of liquor on Sunday, and additionally nonresident and corporate ownership of licenses to sell. The objection was refused. This Court stated the Attorney General's ballot title accurately reflected the effect of the proposition and informed the electorate concerning the principal thrust of the petition which was county option liquor drink sales which provided for a new enforcement agency and continuation of regulation and taxation of the trade. Thereupon it was held that the title conformed with § 9 of 34 O.S.Supp.1983, although a grammatical change was made by the Court.

■ Here, as in the county option case cited above, the determination is made that the Attorney General's proposed ballot title fulfills the requirements of 34 O.S.Supp. 1989 § 9 because it accurately reflects the effects of the proposition by informing the electorate concerning the principle thrust of the proposition. The character and thrust of the proposed law is adequately explained. The purpose of the proposal is to return the laws concerning education and taxation to the point at which they were prior to the passage of House Bill 1017. In doing so certain reforms are eliminated as expressed by the Attorney General's ballot title.

Recently this Court considered the issue of ballot titles in *In Re Initiative Petition No. 342, supra* at p. 333. There the ballot title was held to be deceptive and misleading and to not accurately reflect the contents of the petition. In that case the petition covered subjects as diverse as the power of eminent domain and the terms and qualifications of members of the Corporation Commission. The ballot title, as in this case, reflected only a portion of the changes to be made by the initiative. The Court observed that the ballot title did not adequately explain the effect of the proposal. In this case the effect of the proposal is completely explained in the first sentence of the ballot title written by the Attorney

General: "This measure replaces newly enacted House Bill 1017 with the laws existing before the Bill's passage." Herein lies the crucial distinction between Initiative Petition No. 347 and Initiative Petition No. 342 discussed immediately above. Here, although there are many different provisions included in the state question, the effect of the proposal is easily explained in one sentence.

## III.

### SIGNATURE COUNT

This Court referred the challenge to the signature count to a referee of this Court for purposes of conducting evidentiary hearings, making factual findings and reporting conclusions of law. The report of the referee was made to the Court on the eighth day of February, 1991. The referee's report finds Initiative Petition No. 347, through its various conterparts contains a total of 126,757 valid signatures. This total is 33,076 more signatures than the number of 93,683 required by Art. V § 2 of the Oklahoma Constitution. Nineteen thousand and seventy-three signatures were disallowed.

The referee allowed twenty days for the parties to file exceptions to his report. Within that time exceptions were filed by Protestant Elizabeth Parker and Protestants Singer and Brimer.

The two groups of protestants attacked the validity of sufficiency of the signatures on different bases. The Singer and Brimer protest urged the invalidity of all signatures because of deceptive practices utilized by the proponents. The Parker protest questions the validity of signatures for other reasons including improper circulation, lack of voter registration, defects in the notarial act and technical defects.

### A.

### PROTESTANTS SINGER AND BRIMER'S ARGUMENTS

■ Protestants Singer and Brimer introduced evidence to show that circulators of the initative petition had not been trained or educated as to the contents of the petition or House Bill 1017. The referee notes in his report that the fact sheet distributed by the circulators of the petition was shown by the evidence to be expressive of opinion rather than fact and substantially inaccurate. The referee noted also that no evidence was introduced tending to show an intent to deceive, nor was there evidence that any individual signer of the petition was mislead through reliance on the fact sheet or the lack of familiarity of the circulators with the petition or House Bill 1017. Because of this lack of proof of actual deception of individual voters the referee concluded the evidence did not tend to disqualify any specific signatures appearing on the petition. The acts of circulators are presumed to be legal and not fraudulent. A petition will not be declared invalid on the mere allegation that some signers may have been misled by statements of circulators relative to the effect of the proposed law. *In re Initiative Petition No. 281, State Question No. 441,* 434 P.2d 941 (Okl.1967). As stated in *In re Initiative Petition No. 142, State Question No. 205,* 176 Okl. 155, 55 P.2d 455 (1936), this Court will not interfere with the actions of electors under the theory that some of the signators *may have been* deceived.

■ Singer and Brimer also put on testimony before the referee tending to demonstrate that many of the most worthwhile reforms in House Bill 1017 were repealed only by listing in the body of the petition the repealed section numbers. It was urged that this was deceptive because the petition did not explain the reforms to be repealed. This deficiency is alleged by these protestants to invalidate all signatures. The referee noted again there was no testimony from any signator that this infirmity resulted in their failure to comprehend the significance of signing the petition. The referee also noted that this argument goes to the invalidity of the petition as a matter of law, an issue which was not tendered for his resolution by the order of reference. As indicated in this opinion this Court has determined that the petition

is not unintelligible as a matter of law because the petition clearly states its purpose as returning the law to the position it was in prior to the passage of House Bill 1017. It is not necessary for each signator to be fully aware of every detail of a petition for his assent to be valid.

### B.

### PROTESTANT PARKER'S ARGUMENTS

Protestant Parker's challenges to signatures were on an individual basis. The proponents did not controvert any of the disqualifications of signatures as found by the referee, and those disqualifications are thus admitted. Technical challenges resulted in disqualification of 2,027 signatures by uncontroverted evidence. Fourteen individuals signed the petition more than once, and thus fourteen signatures were disqualified, and fifty-one signatures were disqualified because the notary's commission had expired.

In accordance with *In re Initiative Petition No. 317, supra,* challenges to 3,203 signatures were refused. The basis of this challenge was signators residing outside of Oklahoma City and Tulsa gave post office box numbers as their residence.

Voter registration challenges were upheld against 12,813 signatures on the basis that these individuals were not registered voters. That evidence was also uncontroverted.

Parker presented evidence that tended to show that two petitions containing forty signatures were circulated prior to the prefiling of the petition with the Secretary of State. The proponent adduced evidence from the printer, the individuals distributing the petition, the circulators and notaries responsible for the two facially premature signature sheets. This evidence uniformly demonstrated the early dates on the Berrong and Fleming petitions were scrivener's errors. The referee determined as a matter of fact that these petitions were not circulated early and refused to disqualify the forty signatures.

Additionally, the referee found as a matter of fact that the signature tally of presumptively valid signatures (145,796) was incorrect as demonstrated by Parker, and accordingly he corrected this count by deducting 155 from the count.

Protestant Parker produced evidence which proved one talley sheet was left unattended on the counter of a cafe in Kay County. In accordance with the teaching of *In re Initiative Petition No. 224 etc.,* 197 Okl. 432, 172 P.2d 324 (1946), that sheet, with nineteen signatures, was disqualified as not having been signed in the presence of the circulator. Parker's request that all Kay County petitions should be invalidated on the basis that the testimony showed some other unidentified petitions were left unattended was refused by the referee.

Seven notaries notarized 45,732 signatures. Parker sought to disqualify all these signatures on the basis that the notaries did not adhere to the requirements of the Uniform Laws of Notarial Acts, 49 O.S.Supp.1990 § 111 et seq. The specific objection was failure to adhere to § 113 of the Act, which reads in part:

> ... the notarial officer must determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the officer ... is the person whose true signature is on the statement verified.
>
> \* \* \* \* \* \*
>
> F. A notarial officer has satisfactory evidence that a person is the person whose true signature is on a document if that person is personally known to the notarial officer, is identified upon the oath or affirmation of a credible witness personally known to the notarial officer or is identified on the basis of identification documents.

Protestant Parker presented testimony tending to show these seven notaries did not comply with the provision of the above act. The referee stated:

> ... they had no prior personal knowledge of the identity of the individual appearing before them, in no case was anyone introduced to them upon the af-

.

firmation of a credible witness, and none of the notaries made a practice of requiring identification documents prior to notarization of each signature.

The evidence put before the referee led him to conclude that each notary knew, or came to know, a number of the circulators through repeated contacts. Out of the 45,-732 signatures contested by virtue of lack of personal knowledge the referee determined that 32,471 were rehabilitated by evidence that the notaries knew them personally before the petition was returned to the Secretary of State.

All signatures in the questioned 45,732 were allowed by the referee in the face of the § 113 challenge on the basis of what, for lack of a better term, shall be referred to as institutional knowledge. Except for the 3,958 signatures disallowed in this group, all circulators had filed copies of voter registration cards with the proponents. The notaries were aware of this fact. The referee stated in his report the purpose of these cards was to establish the circulators were registered voters, but they could also be considered identification documents.

Verification of signatures is governed by 34 O.S.1981 § 6.[9] Interpretation of § 6 is governed by 34 O.S.1981 § 24 providing:

The proceeding herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded.

In an earlier case this Court held in an initiative petition the certificate of a notary including the jurat must, in order to accomplish the purpose for which it was intended, speak the truth. The certificate is prima facie correct, the jurat imports a verity. However the non-appearance of the *affiant* destroys the verification. Consequently failure of the affiant to appear personally before the notary was held to invalidate the signatures on those sheets. *In re Initiative Petition No. 142, State Question No. 205,* 176 Okl. 155, 55 P.2d 455 (1936). See Also *In re State Question No. 236, Referendum Petition No. 73,* 183 Okl. 355, 82 P.2d 1017 (1938). This line of reasoning continues through *In re Initiative Petition No. 281, State Question No. 441,* 434 P.2d 941, at pp. 953–956 (Okl.1967). Once again the primary issue being decided was the failure of the notary to administer an oath to the circulator or to call the circulator's attention to the fact that he was swearing to the truth of the matters contained therein. In the course of resolving that issue the Court noted the requirements for execution of a valid affidavit in a situation where the provisions of 34 O.S.1981 § 6 determine the validity of such an affidavit.

... each of the circulators involved in this challenge appeared before the notary public involved for the purpose of doing that which was necessary to be done by him or her to give validity to each sheet of signatures obtained by him or her, and, in the absence of evidence to the contrary, we assume that he or she was cognizant of the effect of the statement involved and knew that it was to be a sworn statement. *In each instance, the affiant signed the affidavit in the presence of the notary public, and the notary public affixed his jurat thereto.* We think that what was done in this case constitutes substantial compliance with 34 O.S. 1961 § 6, ... (emphasis added)

**9.** 34 O.S.1981 § 6 provides:

Each sheet of every such petition containing signatures shall be verified on the back thereof, in substantially the following form by the person who circulated said sheet of said petition, by his or her affidavit thereon and a part thereof:

State of Oklahoma

ss.

County of _____

I, _____, being first duly sworn, say: That I am a qualified elector for the State of Oklahoma and that (Here shall be legibly written or typewritten the names of the signers of the sheet), signed this sheet of the foregoing petition, and each of them signed his name thereto in my presence: I believe that each has stated his name, post office address, and residence correctly, and that each signer is a legal voter of the State of Oklahoma and county of _____ or for the city of _____ (as the case may be). (Signature and post office address of affiant.) Subscribed and sworn to before me this _____ day of _____ A.D. 19__.

(Signature and title of the officer before whom oath is made, and his post office address.)

 In the case before the Court now the circulators appeared before the notaries, and signed or acknowledged their signatures. As the last quoted case states, these acts are in substantial compliance. The emphasis in the statute is *the validity of the signatures as attested to by* the signature of *the circulator.* Protestants attempt to focus on the statutory correctness of the notaries' verification which amounts to merely a clerical or technical error. Such omission does nothing to impeach the oath of the circulator in swearing: (1) that he is an elector, (2) that the signers of the sheet signed in his presence, and (3) that he believes their address is correct. Irregularities in verification are allowable without invalidating portions of a petition in the absence of a fraudulent intent or guilty knowledge on the part of the circulator. *In re Initiative Petition No. 224, etc.,* 197 Okl. 432, 172 P.2d 324 (1946).[10] Additionally, fraud or guilty knowledge on the part of the circulator will be not imputed but must be affirmatively established by the protesting party. *In re Initiative Petition No. 272, State Question No. 409,* 388 P.2d 290 (Okl.1964). In view of these precepts, the protestant's invitation to find failure of substantial compliance with 34 O.S. § 6 is refused. There is no evidence of misfeasance or malfeasance on the part of any individual circulator. Protestant Parker is correct in stating that an admitted or proven false circulator's verification destroys the probative value of the verification. However, proof of a technical or clerical error in the notary's jurat is not interchangeable with proof that the circulator's verification is false. Therefore the referee's determination of the validity of the signatures contested by reason of failure to demand documentary proof of identification at the time the sheets were verified is adopted. However, the referee's exclusion of 3,958 signatures on the basis that the proponent's files did not contain copies of their voter registration cards (so as to provide institutional knowledge of the circulator's identity) is disapproved and those signatures are determined valid.

 Protestant Parker sought additional time to check voter registration cards of Oklahoma County in order to prove that portions of the county's signers were not registered voters at the close of her case-in-chief. At this time the referee denied the motion and Parker made an offer of proof. In this offer of proof she stated she expected to be able to show that twenty-five per centum of the Oklahoma County voters, or 10,377, were challengeable for lack of voter registration. Failure to grant additional time is here assailed on due process grounds for failure to grant her reasonable time for preparation of her case. *First National Bank v. Oklahoma Savings & Loan Board,* 569 P.2d 993 (Okl.1977) and *Libertarian Party of Oklahoma v. Oklahoma State Election Board,* 593 F.Supp. 118 (W.D.Okl.1984). It is unnecessary to answer the merits of this argument as the offer of proof, if fulfilled, would not exclude enough signatures to change the ultimate determination of sufficiency of the initiative petition. *In re Initiative Petition No. 224 etc., supra* at p. 328.

In summary, the referee determined that 2,027 signatures were disqualified because of technical challenges. In reality these challenges were based upon material defects, evidence of which has not been controverted, and the validity of these disqualifications is accepted. Fourteen signatures were disqualified by virtue of the fact they appeared in the petition twice; that finding is accepted. Fifty-one signatures are disqualified by virtue of the notary's commission having expired. The referee disqualified 12,813 signatures as belonging to individuals not registered as voters; evidence of that fact being not controverted, this

---

**10.** Technical and clerical errors which may be disregarded are items such as notary public's failure to sign certificate, where his seal bearing his name was attached, or failure to give a post office address, attach seal, or to state date of expiration of commission or failure of the petition to show the date of verification or failure to show the identity of the circulator in body of certificate which notary public certified was subscribed and sworn to before him, do not invalidate petitions in the absence of fraudulent intent or guilty knowledge. *In re Initiative Petition No. 224, State Question No. 314,* 197 Okl. 432, 172 P.2d 324 (1946).

finding is accepted. The referee's correction of the presumptively valid signature count as being one hundred and fifty-five in excess of the actual count is similarly accepted. The finding that nineteen signatures were affixed to a counterpart in the absence of the circulator is accepted. The referee's conclusion that 3,958 signatures should be excluded by virtue of lack of institutional knowledge is disapproved. The objection to these signatures is based on clerical and technical errors in the notary's jurat, which as previously discussed, does not impeach the affidavit of the circulator.

Consequently the presumptively valid signature total as found by this Court must be reduced by 15,079. This leaves the total number of valid signatures at 130,717. Ninety-three thousand, six hundred and eighty-three signatures are required to bring this proposition to a vote. The petition contains 37,034 more signatures than needed for the initiative petition to be numerically sufficient. As modified, the report of the referee is approved.

## ADJUDICATION

Initiative Petition No. 317 is declared sufficient, both numerically and legally, for submission to the vote of the people of the State of Oklahoma as State Question No. 639. The ballot title submitted by the Attorney General is approved.

OPALA, C.J., HODGES, V.C.J., and LAVENDER, SIMMS, DOOLIN and ALMA WILSON, JJ., concur.

KAUGER and SUMMERS, JJ., concur in result.

OPALA, Chief Justice, concurring:

I concur generally in today's pronouncement that the petition under consideration qualifies for submission to a vote of the electorate. By my concurrence today I do not intend to be understood as receding from my continued and unswerving commitment to *Threadgill v. Cross.*[1] *Threadgill* teaches that the conformity of a measure's content to constitutional norms may not be the subject of a judicial examination in advance of the initiative petition's adoption. Preadoption constitutional challenges may address only vitiating infirmities in the initiative process itself as the sanctioned people's conduit for pressing legal changes.[2] The electorate's effort at legislating should neither be scrutinized nor delayed by attacks that do not affect the petition's compliance with some *sine qua non* submission requirement. I welcome and salute the court's effort to restrict today the scope of constitutional challenges which may be entertained *before* the initiative petition goes to the electorate.

### I

### THE "PRUDENTIAL RULE"

The time-honored prudential rule is offended whenever a court allows challenges to the constitutional validity of legislation before it becomes law. The prudential rule of necessity, adhered to today by *all* state and federal courts, holds that constitutional issues must not be resolved in advance of strict necessity.[3] No necessity exists for our presubmission resolution of content-based challenges to a *measure* which do not impair the initiative petition's legal fitness for a vote by the people. In presubmission stages (a) we cannot be sure that

---

1. 26 Okl. 403, 109 P. 558 [1910].

2. My commitment to *Threadgill, supra* note 1, is reported in several prior decisions. *See In re Initiative Petition No. 349* [No. 76,437, February 20, 1991] (Opala, C.J., concurring in part and dissenting in part); *In re Initiative Petition No. 341,* Okl., 796 P.2d 267, 275 [1990] (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317, Etc.,* Okl., 648 P.2d 1207, 1220, 1222 [1982] (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315, Etc.,*

Okl., 649 P.2d 545, 554–555 [1982] (Opala, J., concurring in result).

3. *Smith v. Westinghouse Elec. Corp.,* Okl., 732 P.2d 466, 467 n. 3 [1987]; *I.N.S. v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 [1983]; *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 [1936] (Brandeis, J., concurring); *see also Schwartz v. Diehl,* Okl., 568 P.2d 280, 283 [1977]; *Dablemont v. State, Department of Public Safety,* Okl., 543 P.2d 563, 564–565 [1975].

when the petition is submitted for a vote the electorate will adopt the measure as law and (b) there is *not* then a lively controversy in which antagonistic adversaries press for testing a legal norm's validity against the backdrop of facts unfolded when the measure was applied as law. Where there is no forensic scenario in the context of which challenged law is to be enforced, courts will not assess the attacked norm's constitutional soundness *in vacuo.*[4] *Any departure from these basic teachings of Threadgill creates an impermissible burden on the people's fundamental-law power to initiate and pass measures that may change the state's constitution as well as her statutes.*[5]

## II

## THE PEOPLE'S INITIATIVE PROCESS SHOULD NEITHER BE DELAYED NOR BURDENED BY JUDICIAL INQUIRY INTO THE CONSTITUTIONALITY OF A PROPOSED MEASURE IF THE INITIATIVE PETITION COMPLIES WITH THE *SINE QUA NON* REQUIREMENTS FOR SUBMISSION

Constitutional judicature that takes place in the absence of a lively controversy *hobbles and retards* the initiative process in this court, causing *undue delay* in clearing the petition for a vote by the people. This court's initiative jurisprudence should be most expeditious to provide due deference to the people's fundamental-law opportunity for the exercise of power to propose law, constitutional and statutory.[6]

The delay caused in this court by an overextended constitutional inquiry in pre-submission stages of the process violates the statutory scheme designed to vitalize the initiative and referendum provisions of our fundamental law.[7] The legislature's intent in enacting these provisions was to implement the constitutional power of the people to make law or change their constitution.[8] When this court superimposes its own procedural hurdles in the path of that regime, it needlessly delays the electorate in its pursuit of the valued right to legislate directly. The time lag between a point of protest to an initiative petition and the petition's submission to the people should be reduced as much as possible by permitting only those challenges to be advanced in this court which, if sustained, would make the initiative process fatally defective as the law's vehicle for people-proposed changes in the law and hence would operate to bar the petition's submission.

## III

## RESTRICTIONS ON THE PEOPLE'S RIGHT TO LEGISLATE

### A

## THE THRESHOLD TEST FOR SUBMISSION

An initiative or referendum petition may be declared ineligible for a vote by the people *only* when it is fraught *with a fatal impediment to its submission.* It cannot be withheld from a vote for infirmities which, even if upheld, would prevent the

---

4. *Smith v. Westinghouse Elec. Corp., supra* note 3.

5. Art. 5, §§ 1–8, Okl.Const. In Oklahoma Tax Commission v. Smith, Okl., 610 P.2d 794, 807 [1980], we stated that Art. 5, §§ 1, 2 and 7, together "comprise an initiative system whereby both the people and the Legislature may propose legislation independently, and neither *can block the effort of the other during the process* ...." Our teaching in *Smith* applies with equal force to interference by the judicial department.

6. Direct legislation means legislation by the people. Representative legislation means legisla-

tion through the elected representatives (legislators).

7. 34 O.S.1981 §§ 1 et seq. *See also In re Initiative Petition No. 281, State Question No. 441,* Okl., 434 P.2d 941, 952 [1967].

8. The pertinent provisions of Art. 5, § 3, Okl. Const., are:
 " * * * Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State and addressed to the Governor of the state, who shall submit the same to the people. *The Legislature shall make suitable provisions for carrying into effect the provisions of this article.*" (Emphasis added.)

measure from passing constitutional muster, in whole or in part, as enforceable law *after* its adoption by the people. The initiative petition need only pass a *threshold test* to qualify for submission. It must (a) be in substantial compliance with the *sine qua non* procedural requirements for submission, (b) address but a single subject [9] and (c) embrace content appropriate for lawmaking by the people.[10] Once the threshold *submission test* is met, the measure's potential infirmities as enforceable law must await judicial scrutiny until *the adopted measure's content* can be applied in the context of a lively postadoption adversary contest.

## B

## THREE CATEGORIES OF PERMISSIBLE CHALLENGES

Challenges to an initiative or referendum petition may be divided into three classes. Two of these may be advanced before submission,[11] the third is available *only* in postadoption stages.[12]

1. *A Challenge To The Petition For Noncompliance With A Sine Qua Non Procedural Requirement For Submission.*

In *Community Gas and Service Company v. Walbaum* [13] the court invalidated an initiative petition which failed to contain

a required warning that signing the petition twice would constitute a felony. The warning clause was held to be a *sine qua non* requirement to the petition's validity.[14]

I would allow any presubmission challenge based on a petition's failure to conform to some *mandatory* or *sine qua non* constitutional or statutory *procedural* norms—as distinguished from a content-based challenge to the measure itself—*if the procedural infirmities are apparent on the face of the petition.* The people are without a constitutional claim to pass legislation in a manner that falls short of compliance with the minimum standards of prescribed procedure.

2. *A Content-based Challenge To The Petition For Noncompliance With A Sine Qua Non Requirement For Submission.*

*In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma [Norman],* [15] the court considered two initiative measures for city-law changes [16]—a proposed ordinance and a city charter revision. The court held that the proposed ordinance could not be submitted to a vote because the subject matter of the measure was found to lie *outside the people's range of power to legislate.* Because the charter of Norman—i.e., the city's own constitution—prohibits any legislation on the proposed subject, the authori-

**9.** *In re Initiative Petition No. 344,* Okl., 797 P.2d 326, 330 (1990); *In re Initiative Petition No. 342,* Okl., 797 P.2d 331, 333 (1990).

**10.** *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma,* Okl., 534 P.2d 3 [1975].

**11.** The two classes of permissible presubmission challenges are dealt with in *Community Gas and Service Company v. Walbaum,* Okl., 404 P.2d 1014 (1965), and *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma, supra* note 10 at 8; see also text in Part III(B)(1) and (2), *infra. See in this connection* Gordon and Magleby, Pre–Election Judicial Review of Initiatives and Referendums, 64 Notre Dame L.R. 298, 302 (1989); Grossman, The Initiative and Referendum Process: The Michigan Experience, 28 Wayne L.Rev. 77, 111 (1981); Note, The Judiciary and Popular Democracy:

Should Courts Review Ballot Measures Prior to Elections?, 53 Fordham L.Rev. 919 (1985).

**12.** *See Threadgill, supra* note 1, and text in Part III(B)(3), *infra; see in this connection* Gordon and Magleby, *supra* note 11 at 304; Grossman, *supra* note 11 at 111; Note, *supra* note 11 at 922.

**13.** *Supra* note 11 at 1016.

**14.** The court has followed *Walbaum, supra* note 11, on several occasions. *See, e.g., Morehead v. Dyer,* Okl., 518 P.2d 1105, 1107 (1974); *Matter of Initiative Petition,* Okl., 718 P.2d 1353, 1354 (1986); *In re Initiative Petition No. 344, supra* note 9 at 330; *cf. In re Initiative Petition No. 342, supra* note 9 at 333.

**15.** *Supra* note 10.

**16.** In a city legal system, the city's constitution is called the charter and its statutes are known as ordinances.

ty to make law on that very subject is to be viewed as withheld from the people's direct power to legislate. On the other hand, a proposed change in the city charter was held to be within the scope of the municipal electorate's initiative power.

If a matter stands withheld from legislative reach by the State's fundamental law or by a city charter, neither the lawmaking body nor the people can legislate on that subject. Subjects upon which the legislature itself cannot enact laws are equally unavailable for the peoples' lawmaking by initiative process. I would hence allow a challenge to be advanced in presubmission stages *if,* under the provisions of the city charter or of the state constitution, the proposed measure to be voted upon is claimed to deal with a subject on which the people may not make law. That kind of presubmission attack does not call for judicial examination of the measure's content for constitutional conformity *but rather* assails the measure as entirely *dehors* the scope reserved for the people's direct lawmaking authority.

In *Norman* the court used overbroad and unguarded language which appeared to signal its total departure from *Threadgill*'s teachings. In my view, it was there unnecessary to overrule *Threadgill.* The court needed only to say that its teaching of presubmission forbearance was inapplicable to the challenge pressed in *Norman.* I would today confine *Norman* to its proper scope and give continued vitality to *Threadgill*'s general message of restraint.

3. *A Content-based Challenge To The Petition, Which Is Unrelated To Any Sine Qua Non Requirement For Submission And Attacks The Measure's Application As Invalid Law In Postadoption Stages*

In *Threadgill* we declined to entertain an attack launched on the constitutional validity of a measure proposed for adoption by the initiative petition. We recognized there that preadoption judicial testing of proposed measures would invade the legislative prerogative "to determine what laws shall be

passed, leaving it to the other departments to question or determine the validity of such laws only when they come to be enforced against some one whose rights they affect."[17] *Threadgill* teaches that a measure's conformity to constitutional norms is not subject to judicial examination in advance of the petition's adoption as law.

The people of this state may rightfully demand an election on any measure they propose which might prove constitutionally objectionable in some postadoption application. The legislature itself would be equally free to pass laws that may, when enforced, turn out to be constitutionally infirm. This court does not "pluck" bills moving through the legislative process for a microscopic review of their constitutional orthodoxy. Neither should the judiciary be allowed to arrest people-initiated measures by probing into their potential conformity to the constitution's norm *after* they become enforceable as law. The people *qua* lawmakers must be placed as nearly as possible in the very same legal position as that occupied by the legislature. Both lawmaking processes merit an equal measure of freedom to shape and promulgate laws unimpaired by the judicial department's gauge of fundamental-law compliance.

### SUMMARY

Once an *initiative petition* passes muster under the threshold test for submission to a vote of the people *no* constitutional attacks addressed to the *measure's* content as enforceable law may be judicially entertained. All other attacks must await the measure's adoption and its application in the context of a lively postadoption controversy between antagonistic adversaries with legal standing to press challenges. My concurrence today is not to be mistaken for abandonment of my commitment to *Threadgill*'s teachings insofar as they require that when an initiative petition has satisfied the threshold submission test it stands immune from constitutional attack

17. *Threadgill, supra* note 1 at 563.

launched on its content in advance of adoption.