In re **INITIATIVE PETITION NO. 358, STATE QUESTION NO. 658.**

No. 82041.

Supreme Court of Oklahoma.

Feb. 24, 1994.

Rehearing Denied March 24, 1994.

Daniel J. Hoehner, Chubbuck, Bullard & Hoehner, Duchess Bartmess, Oklahoma City, for protestants.

Lee Slater, Thomas L. Spencer, York & Slater, Oklahoma City, for proponents.

ALMA WILSON, Justice:

The issue presented is whether Initiative Petition No. 358 is insufficient because the proposed legislative measure violates the Oklahoma Constitution. We find and hold that Initiative Petition No. 358 is sufficient and should be submitted to a vote of the people of the State of Oklahoma as State Question No. 658.

On April 19, 1993, Oklahoma Best, Inc., Douglas A. Branch and Melvin C. Hall (proponents) caused Initiative Petition No. 358, State Question No. 658 to be filed with the Secretary of State. The signed copies of the initiative pamphlets were returned to the Secretary of State within ninety days, on July 15, 1993.[1] The Secretary of State made a physical count of the signatures and, on July 30, 1993, certified that the total number of valid signatures of Oklahoma registered voters is 197,798, and the total number of signatures required for an initiative petition is 111,229.[2] The signatures appearing to be numerically sufficient,[3] notice of the filing and time to protest was published on August 1, 1993. Within the time allowed, Dwayne Burrows of Sallisaw, Oklahoma, Larry Kettles of Guthrie, Oklahoma, David Vance of Edmond, Oklahoma, and David Murphy, Gary Simpson, Jeff True and Charles Wooden of Oklahoma City, Oklahoma, (protestants) filed their protest to Initiative Petition No. 358, State Question No. 658 on August 9, 1993.[4] Pursuant to this Court's order, protestants filed their brief in support of the protest on October 15, 1993; proponents filed their response brief on November 15, 1993; and protestants filed their reply brief on November 29, 1993. Additionally, on December 2, 1993, proponents filed an application requesting this Court to disregard the new issues raised in the reply brief and, on December 9, 1993, protestants filed their response to the application.

Initiative Petition No. 358, State Question No. 658 proposes enactment of the "Oklahoma Lottery Act" which consists of thirty-one sections including the short title, severability clause and repealer of conflicting provisions. Review of the proposed statutory scheme reveals that its contents are generally explained in the suggested Ballot Title and the gist of the proposition set forth on the

1. 34 O.S.Supp.1993, §§ 3 and 8.

2. 34 O.S.Supp.1993, §§ 6.1 and 8.

3. According to the Secretary of the State Election Board, the State office receiving the highest number of votes at the last general election held on November 3, 1992, was that of Presidential Elector for which the total votes cast were 1,390,359 and eight percent thereof is 111,229. The Oklahoma Constitution, Art. V, § 2, provides that eight percent of the legal voters shall have the right to propose any legislative measure and that the eight percent shall be based upon the total number of votes cast at the last general election for the State office receiving the highest number of votes at such election. We have heretofore accepted the votes cast for the Presidential Elector as the bases for this calculation. *In re Initiative Petition No. 315, State Question No. 553,* 649 P.2d 545, 552 (Okla.1982).

4. 34 O.S.Supp.1993, § 8. On August 11, 1993, the Oklahoma Christian Coalition, Inc. and Ami Shaffer, an individual registered voter, filed a protest challenging the form and constitutionality of the Initiative Petition and objecting to the count, but the protest and the objection to the count were withdrawn on August 26, 1993, and neither has been revived. Sixteen other registered voters filed notices of intent to protest on August 11, 1993, but submitted no other filings. The protestants herein do not challenge the sufficiency of the signatures.

signature pages which provide:[5]

> This measure would create a State Lottery. It would be operated by the Oklahoma Lottery Authority. The Authority would be run by a board of directors. The Governor would appoint the directors. The Authority would be an independent public body of the state. The Authority would be run with funds from the Lottery. It would not receive tax dollars. Around 50% of lottery money would go for prizes. The Authority would pay its own start-up costs. After that, it would give around 35% of the lottery money to the State. One-half of the State's share would be used by the Oklahoma Center for the Advancement of Science and Technology. At least 35% of the State's share would be used for the capital needs of educational entities. The rest of the State's share would be used for the capital needs of the State. The Authority would select people to sell lottery tickets. The Authority would choose the type of lottery games to be played. The Authority could not permit other forms of gambling. The State Lottery would be the only legal lottery. This measure contains many other laws. Those laws would regulate the Lottery and provide criminal penalties.

The protest and briefs in support assert that the proposed measure is unconstitutional on its face and that its implementation will violate our state constitution. The protestants contend that resolution of their constitutional challenges will avoid a needless election and spare the people of the futile effort of voting on a measure which could not be applied or enforced because its provisions are constitutionally unacceptable. Proponents respond that the proposed Lottery Act is not unconstitutional on its face, but if any provision is found to be facially invalid, that part should be stricken under the severability clause and the petition, as amended, should be submitted to a vote of the people. While agreeing with protestants that this Court may review the constitutional challenges to the proposed legislation, proponents argue that this Court may not withhold the proposed measure from the voters except upon a finding that the constitutional violation strikes at the very heart of the proposed measure.

■ This Court has jurisdiction to entertain protests to initiative petitions pursuant to Section 8 of Title 34 of the Oklahoma Statutes.[6] Prior to 1973, protests were filed with the Secretary of the State and reviewed by this Court in original actions seeking extraordinary relief. With strict adherence to the separation of powers doctrine,[7] judicial review of the contents of a measure proposed by an initiative petition and opinion upon the constitutionality thereof were withheld from the extraordinary relief available. *Threadgill v. Cross*, 26 Okla. 403, 109 P. 558 (1910).[8]

---

5. The ballot title and the gist of the proposition are identical. The protestants do not challenge either the ballot title or the gist of the proposition.

6. Section 8 was amended in 1973 deleting the provisions for protest to the Secretary of State and adding provisions for protest before this Court. 1973 Okla.Sess.Laws, ch. 78, § 1.

7. Okla. Const., Art. IV, § 1.

8. In *Threadgill v. Cross*, a writ of mandamus was sought ordering the Secretary of State to file an initiative petition proposing a constitutional amendment. Secretary of State Cross had determined that the proposed repeal of the constitutional provisions that prohibited the sale of liquors was contrary to the state's Enabling Act of Congress which required the state of Oklahoma to prohibit the sale of liquors for a period of 21 years in that part of the state formerly Indian Territory. In rejecting the Secretary of State's defense to the mandamus request, the *Threadgill* Court reasoned that the court may not restrain the enactment of an unconstitutional law under the fundamental doctrine of separation of powers of our three equal and independent departments of government. The Court found that the 1909 statutes governing the initiative process imposed upon the Secretary of State the ministerial and mandatory duty to file initiative petitions, the writ of mandamus issued. In this vein, the *Threadgill* Court said:

> If placing of such duties upon such ministerial officers gives in turn to them the right and power to question the validity of any or all the amendments proposed, and to refuse to act when they decide that such proposed measure will be invalid, then the most subordinate ministerial officer of the state having any duties to perform in connection with an election may himself do indirectly that which he could not have, nor any other citizen of the state have the courts do by proceeding instituted for that purpose, to wit, pass upon the validity of the proposed measure and stay the election by a

With the 1973 statutory change, exception to the *Threadgill* rule of withholding pre-election determination of the constitutionality of the contents of a proposed legislative measure was carved out in *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma*, 534 P.2d 3 (Okla.1975). The exception to *Threadgill v. Cross* formulated in *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma* is grounded in the separation of powers doctrine, which prevents the Legislature from enjoining purely administrative duties upon this Court, and the inherent power of this Court, upon a proper request, to grant extraordinary relief from the costly expenditure of public revenues on a needless election.[9] Subsequent to *In re Supreme Court Adjudication of Initiative Petitions in Nor-* *man, Oklahoma* and under its rule, federal constitutional challenges to the contents of proposed statutes [10] and proposed constitutional amendments [11] and state constitutional challenges to the contents of proposed constitutional amendments [12] have been reviewed to prevent costly expenditure of public revenues on needless elections.

■ The doctrine of separation of powers [13] prevents judicial interference with the initiative law-making process with the same force that it prevents legislative restriction upon this court's inherent powers. In accordance with the notions of separation of powers, we have consistently confined our pre-election review of initiative petitions under 34 O.S.Supp.1993, § 8 to clear or manifest facial constitutional infirmities.[14] Constitutional

judicial decree, if it be determined that the proposed measure is invalid.
*Threadgill v. Cross*, 109 P. at 562.

9. In *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma*, protests were lodged against two initiative petitions relating to the same subject, utility rates to be charged by the municipal utility. One initiative petition proposed amendment to the city charter and the other proposed an ordinance. This Court held that the initiative petition proposing the ordinance was insufficient as a matter of law and the initiative petition proposing amendment to the charter was sufficient. In so holding, this Court said:

Both proponents and opponents of these initiative petitions have argued the constitutional questions. In considering the sufficiency of these petitions, this court was made cognizant of its statement as to consideration of the constitutionality of an initiative petition in *Oklahomans for Modern Alcoholic Beverage Controls v. Shelton*, 501 P.2d 1089 (1972). There *Threadgill et al. v. Cross*, 26 Okla. 403, 109 P. 558 (1919) was cited. Under present initiative procedure, 34 O.S.Supp.1973 § 8, administrative duties formerly placed on administrative officials have been legislated directly into this court. We believe this court is not limited solely to the duties of an administrative officer or act. It may consider the constitutionality of matters to be considered under the initiative and referendum process as to procedure form and subject matter, when raised, and if in this court opinion such a determination could prevent a costly and unnecessary election.
*In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma*, 534 P.2d at 8.

10. In *In re Initiative Petition No. 349, State Question No. 642*, 838 P.2d 1 (Okla.1992), we consid- ered a challenge to proposed legislation on abortion as facially violative of federal law.

11. In *In re Initiative Petition No. 341, State Question No. 627*, 796 P.2d 267 (Okla.1990), we considered challenges to the face of a proposed constitutional amendment that would establish the Ethics Commission as facially violative of the First Amendment to the Constitution of the United States and the separation of powers provisions of our state constitution.

12. Many protests to initiative petitions have been decided under the one subject rule, Art. XXIV, § 1, Okla. Const. *Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton*, 501 P.2d 1089 (Okla.1972), was handed-down in October, just before the 1973 amendments to § 8 of Title 34, wherein the need for this Court to consider facial violations of the one subject rule to prevent the chilling effect of multiple subjects on the right of the voters to express their opinions on a single subject was voiced. Opinion concurring in part and dissenting in part by Hodges, J., at page 1095. We adopted those views in *In re Initiative Petition No. 314*, 625 P.2d 595, 607 (Okla.1981). See also, *In re Initiative Petition No. 342, State Question No. 628*, 797 P.2d 331 (Okla.1990); *In re Initiative Petition No. 344, State Question No. 630*, 797 P.2d 326 (Okla. 1990). Although we must necessarily review the contents of a proposed measure when considering a challenge under the one subject rule, at issue is the sufficiency of the form of the initiative petition and not the constitutionality of the contents of the proposed measure.

13. Okla. Const., Art. IV, § 1.

14. *In re Initiative Petition No. 349, State Question No. 642*, 838 P.2d 1 (Okla.1992); *In re Initiative Petition No. 348, State Question No. 640*, 820

challenges to the interpretation, implementation or application of an initiative proposal present nothing more than abstract questions and will not be reviewed through this Court's inherent power to grant relief from costly expenditure of public revenues on needless elections.[15]

Previously this Court reviewed the contents of an initiative measure proposing a statutory scheme for a state lottery and determined the initiative petition to be invalid. *In re Initiative Petition No. 332*, 776 P.2d 556 (Okla.1989). In that case, the proposed statutes would have allowed the Lottery Commission to distribute lottery proceeds for public purposes without any guidelines as to the object or state agency to be benefitted or the amounts to be disbursed. We held that the proposed measure, on its face, would delegate the purely legislative power of appropriation contrary to Art. IV, § 1 and Art. V, § 55, Okla. Const.

■ The protestants rely on *In re Initiative Petition No. 332* for their contention that the instant proposed measure would unconstitutionally delegate fiscal policy making because the Lottery Authority has unbridled authority to create the formula for determining gross revenues and net revenues. Unlike the clear facial constitutional infirmity found in *In re Initiative Petition No. 332*, the

instant proposed measure specifies the percentage of gross lottery revenues to be paid into the state treasury and the purposes for which the revenues may be appropriated by the Legislature.[16] The language of the proposed measure authorizing the Lottery Authority to determine "net revenues" does not clearly contravene Art. IV, § 1 or Art. V, § 55, Okla. Const. Although it is conceivable that the implementation of the proposed measure may result in an unconstitutional usurpation of the legislative power of appropriation, we refrain from further consideration of this argument because implementation cannot be discerned from the face of the proposed measure.

Protestants also argue that the proposed measure, taken as a whole, would legalize lottery gaming for the profit of a special class of the five members of the board of directors and that the Lottery Authority will be vested with powers of all three branches of government to be exercised free from state control contrary to several constitutional provisions. They assert that the benefits to the state are too speculative to establish a relationship between the Lottery Authority and the state and therefore the proposed measure creates a private corporation contrary to Art. V, § 59, Okla. Const., with special privileges contrary to Art. 11, § 32, Art. V, § 51, and Art. IX, § 38, Okla. Const.[17] Proponents

---

P.2d 772 (Okla.1991); *In re Initiative Petition No. 347, State Question No. 639*, 813 P.2d 1019 (Okla. 1991).

**15.** In *In re Initiative Petition No. 348, State Question No. 640*, 820 P.2d 772, 774 (Okla.1991), we refused to consider issues "ensuing from the interpretation or application" of the proposed amendment until same are directly challenged, without considering whether the challenged provisions were integral and non-severable. In that case, we reviewed the contents of the proposed constitutional amendment to require voter approval of new tax statutes which were challenged as facially violative of the one subject rule in Art. XXIV, § 1, Okla. Const. and the Guarantee Clause of the United States Constitution.

In *In re Initiative Petition No. 347, State Question No. 639*, 813 P.2d 1019 (Okla.1991), we considered the federal constitutional challenge and some state constitutional challenges to proposed legislation on public school funding. We refused to consider constitutional challenges to sections of the proposed measure that appear to be severable and therefore would not prevent a

costly and potentially unnecessary election expressly relying upon *Threadgill v. Cross.*

**16.** Section 16 of the proposed measure, with minimal guidelines, authorizes the Lottery Authority to determine "net revenues" and it authorizes the Authority to pay all start-up costs. However, that section specifies that, after the initial start-up costs or after the first year, a *minimum* of 35% of *gross* revenues *shall* be deposited in the state treasury and *approximately* 50% of *gross* revenues *shall* be used for prizes. On its face, the proposed measure does not delegate fiscal policy making to the Lottery Authority. Further unlike the earlier proposed lottery measure, § 16 specifies the purposes for which the 35% of gross lottery revenues transferred to the state treasury shall be appropriated by the Legislature.

**17.** Protestants urge us to glean the private nature of the Lottery Authority from the provision that would exclude the Lottery Authority, its president and employees, from the term "state agency" except when a contrary intention appears

respond that protestants' have failed to show that an integral part of the proposed measure directly violates the constitution and that if any language is found to be unconstitutional it should be severed under the severability clause.

In *In re Initiative Petition No. 315, State Question No. 553*, 649 P.2d 545, 547 (Okla. 1982), this Court said that if a part of a proposed measure which could not be severed without defeating the whole is challenged, then the contents of the proposed measure would be reviewed under the authority of *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma*, supra. In that case, we found that two sections relating to taxation and county option were integral to the proposed parimutuel betting scheme and non-severable and, hence, reviewed those sections for constitutional infirmity.

The integral parts of the instant proposed measure are those provisions which authorize a state lottery and provide a mechanism for operation of the lottery.[18] Protestants do not contend that the language providing these essential components directly contravenes the constitution. Instead, they contend that the implementation of various provisions authorizing the method of operation of the Lottery Authority will create constitutional infirmities. As we have already said, this Court will not interpret the contents of an initiative proposal, nor speculate implementation, at this pre-election stage. Further, if adopted and a constitutional infirmity becomes apparent in the implementation of any of the challenged provisions, the measure expressly provides for severability. Hence, we refrain from further consideration of these arguments.

The protestants also contend that the proposed measure would amend existing law by reference contrary to Art. V, § 57, Okla. Const., and that, in vague, ambiguous and conflicting language, the proposed measure would vest the Lottery Authority with executive and judicial powers contrary to Art. IV, § 1, Okla. Const. Again, these arguments require interpretation of the proposed measure and will not be reviewed. Because we refuse to consider protestants' constitutional challenges to the interpretation and implementation of the contents of the legislation proposed by Initiative Petition No. 358, proponents' application that we disregard arguments raised for the first time in protestants' reply brief is rendered moot.

Initiative Petition No. 358 is legally sufficient for submission to a vote of the people as State Question No. 658. Petitions for Rehearing, if any, shall be filed within twenty days of the filing of this opinion with the Clerk of the Appellate Courts.

HODGES, C.J., and HARGRAVE, SUMMERS and WATT, JJ., concur.

OPALA and KAUGER, JJ., concur in result.

LAVENDER, V.C.J., and SIMMS, J., dissent.

KAUGER, Justice, concurring in result:

I concur with the result reached by the majority. However, I write separately to emphasize that the majority opinion should not be read to signal a return to the teaching of *Threadgill v. Cross*, 26 Okla. 403, 109 P. 558 (1910). *Threadgill* prohibited the consideration of even a patently unconstitutional measure before it was submitted to the vote of the people. After *In re Initiative Petition*

---

specifically in a statute or the Lottery Act and the provisions that would grant to the Lottery Authority the power to close meetings, determine which records are open, create its own budget, adopt regulatory provisions free from the administrative procedure statutes, hire employees free from the statutory control except the ethics statutes, void contracts at will, fix costs and fees to be charged, deposit money in accounts other than in the state treasury, create its own budget, determine its net proceeds and establish its own fiscal year.

18. The unchallenged Ballot Title and gist of the proposition advise the voters that the proposed measure would create a State Lottery to be operated by the Oklahoma Lottery Authority and that the Authority would be a *independent* public body run by a board of directors appointed by the Governor. It is conceivable that any Lottery Authority could administer the proposed measure so as to function as a private entity *independent* of public scrutiny and governmental controls, but such administration is mere speculation at this stage.

No. *349*, 838 P.2d 1, 11 (Okla.1992), *In re Supreme Court Adjudication of Initiative Petition in Norman, Oklahoma No. 74-1 & 74-2*, 534 P.2d 3, 8 (Okla.1975) and *Oklahomans for Modern Alcoholic Beverage Control v. Shelton*, 501 P.2d 1089 (Okla.1972), *Threadgill* is viable only to the extent that: a proposed provision is not severable; the constitutional challenge is "nothing more than an abstract opinion on a hypothetical question";[1] or there is no *apparent* properly preserved constitutional issue.

We advised parties of the dangers of relying on the narrow teachings of *Threadgill* in *In re Initiative Petition No. 349*, 838 P.2d 1, 11 (Okla.1992). We said:

"Even though the proponents continue to cling to *Threadgill v. Cross*, 26 Okla. 403, 109 P. 558, 562 (1910), this Court implicitly recognized in 1975, that the *Threadgill* doctrine was frequently nothing more than a rationalization for deferring obvious issues of constitutionality. The effect of this doctrine, especially when it involves transparently unconstitutional proposals, is subject to the perception by the citizens of our state that their votes, so eagerly solicited, are ultimately meaningless acts in an elaborate charade. The danger of *Threadgill* is that, in effect, citizens may be led to believe that their votes on matters of intense public concern count, when this Court is already fully aware that the proposed measure is subject to being struck down as unconstitutional within months should the voters approve it. Conversely, the vote on an indisputably unconstitutional measure will almost certainly be distorted by wide-spread citizen awareness of the invalidity of the measure. In any event, a truly meaningful vote on the initiative becomes impossible.

The underlying sense of our cases dating back to 1975 is that *Threadgill* trumpets a triumph of form over substance which calls into question the very legitimacy of the initiative process itself by merely postponing the inevitable. For seventeen years, the majority of this Court has understood that the *Threadgill* doctrine has been modified to the extent that it no longer operates as a bar to the pre-submission review of constitutional defects in initiative proposals."

The public should be advised that this Court will not refrain from addressing viable constitutional challenges to a measure in order to prevent a costly and meaningless election. Likewise, the inclusion of abstract constitutional challenges to possible defects will not result in a judicial activism intended to circumvent the right of the people to cast their votes in the initiative process.

OPALA, Justice, concurring in result.

The court declares today that the initiative measure under consideration—which would establish a state-run lottery—qualifies for submission to a vote of the people. While I *concur in clearing the measure for an election,* I write separately to reiterate *my views* on the *outer limit of permissible scrutiny* an initiative measure may undergo when it is before us upon a protest for alleged legal deficiency.

I would not undertake to test the validity of a measure's content *before* its adoption by a vote of the people. My commitment to the *undiluted force* of *Threadgill v. Cross*[1] continues with *undiminished fervor.*[2] *Threadgill* teaches that conformity of a measure's content to the commands of our constitution—state and federal—may not be judicially examined *in advance of the initiative peti-*

1. *In re Initiative Petition No. 247, State Question No. 639*, 813 P.2d 1019, 1031 (Okla.1991).

1. 26 Okl. 403, 109 P. 558 (1910).

2. My unswerving commitment to *Threadgill, supra* note 1, is documented in several reported decisions. *See In re Initiative Petition No. 349*, Okl., 838 P.2d 1, 18 (1992) (Opala, C.J., dissenting); *In re Initiative Petition No. 348*, Okl., 820 P.2d 772, 781 (1991) (Opala, C.J., concurring in result); *In re Initiative Petition No. 347*, Okl., 813

P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *In re Initiative Petition No. 341*, Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317*, Okl., 648 P.2d 1207, 1222 (1982) (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315*, Okl., 649 P.2d 545, 554-555 (1982) (Opala, J., concurring in result); *In re Initiative Petition No. 349*, (No. 76,437, February 20, 1991) (Opala, C.J., concurring in part and dissenting in part) (unpublished opinion).

tion's adoption by the people. Presubmission review of a measure's fundamental-law conformity *should be confined to fatally vitiating infirmities in the initiative process itself.* The electorate's effort at legislating *directly must not* be hindered by pre-election attacks *other* than those which target the petition's compliance with some *sine qua non requirement for submission.*

While on its journey to the ballot box a measure proposed by initiative petition is entitled to the same judicial deference that is accorded a legislative bill in progress. Judges cannot police the lawmaking process for conformity to the constitution without raising an impermissible restraint on the free exercise of political activities.[3] Just as the passage of a seemingly infirm bill in progress will not be enjoined to save the cost of processing the act through the Houses of the Legislature, so, too, an initiative that *passes muster for submission* should not be condemned in advance of the measure's adoption just to avoid a costly election. The *burden or loss borne* by the people when an election fails because the law is later held invalid is the *price to be paid* for our system of consti-

tutional democracy that authorizes the electorate to legislate directly.[4]

## I

## *THREADGILL* AND ITS PROGENY

*Threadgill,* which enjoyed *full* and *unlimited* sway from 1910 until 1975,[5] teaches that an initiative petition need only pass a procedural threshold test to qualify for submission to a vote of the people. It must (a) be in substantial compliance with the *sine qua non procedural* requirements for submission and bear the requisite number of valid signatures,[6] (b) address but a single subject[7] and (c) deal with a subject not explicitly excluded from the people's lawmaking power.[8] Unless a fatal procedural impediment be found in one of these categories, a petition *must be cleared for a vote.* All constitutional challenges to an initiative's content will be postponed to await the measure's adoption as *enforceable law. They may later be pressed in the context of a lively forensic controversy between antagonistic adversaries* by parties with legal standing to sue.[9]

---

3. *Advocacy* for or against a proposed law is *the purest form of political speech.* Restraint upon free speech is prohibited by the terms of Art. 2, § 22, Okl. Const., which provide in part:
   "Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right...."

4. For constitutional provisions that govern the people's right to the initiative and referendum, see *infra* note 14.

5. *See* In re Supreme Court Adjudication of *Initiative Petitions in Norman, Oklahoma,* Okl., 534 P.2d 3 (1975) [Norman], where the court held that the proposed ordinance could not be submitted to a vote because the subject matter of the measure was found to lie *outside the people's range of power to legislate.* As I view *Norman,* its teaching is consistent with *Threadgill* but its language a bit broader than the holding. To me, *Norman trumped an initiative measure that dealt with a subject excluded from the power of initiative lawmaking. My own analysis of Norman places that pronouncement well within Threadgill's rationale. Some post-Norman cases unjustifiably assume our total rejection of Threadgill's teachings.*

6. *See, e.g., Community Gas and Service Company v. Walbaum,* Okl., 404 P.2d 1014, 1016 (1965), where the court invalidated an initiative petition which failed to contain a required warning that

signing the petition twice would constitute a felony. The warning clause was held to be a *sine qua non* requirement of the petition's validity.

7. *In re Initiative Petition No. 344,* Okl., 797 P.2d 326, 330 (1990); *In re Initiative Petition No. 342,* Okl., 797 P.2d 331, 333 (1990).

8. *Norman, supra* note 5; *see also in this connection In re Initiative Petition No. 347, supra* note 2, 813 P.2d at 1039 (Opala, C.J., concurring).

9. *See* Grodin, In Pursuit of Justice at 106 (Univ. of Cal. Press 1989); Gordon and Magleby, Pre-Election Judicial Review of Initiatives and Referendums, 64 Notre Dame L.Rev. 298, 302 (1989); *see in this connection* Grossman, The Initiative and Referendum Process: The Michigan Experience, 28 Wayne L.Rev. 77, 111 (1981); Note, The Judiciary and Popular Democracy: Should Courts Review Ballot Measures Prior to Elections?, 53 Fordham L.Rev. 919, 921–22 (1985). For a discussion of state and federal standing requirements, see *Democratic Party of Oklahoma v. Estep,* Okl., 652 P.2d 271, 274 (1982); *Johnson v. Walters,* Okl., 819 P.2d 694, 711–712 (1991) (Opala, C.J., concurring in part and dissenting in part); *In re Initiative Petition No. 349, supra* note 2, 838 P.2d at 21–24 (Opala, C.J., dissenting); *Hendrick v. Walters,* Okl., 865 P.2d 1232, 1235–38 (1993).

*Threadgill* should be *kept in full force* because it raises a necessary barrier of insulation between the judicial department's judicature and the people's lawmaking. The former is a function of judges, the latter of the people. *Any departure* from the basic teachings of *Threadgill* creates an impermissible burden on the people's fundamental-law power to initiate and pass measures that may change the state's constitution as well as her statutes.

### The Prudential–Rule–of–Necessity Barrier To Deciding Purely Academic Questions

Moreover, the "prudential rule of necessity", adhered to by all state and federal courts, *commands* that constitutional issues not be resolved in advance of strict necessity.[10] Pre-enactment testing of proposed legislation clearly offends the prudential rule. Measures in the process of lawmaking, popular or legislative, are not subject to court-enforced constitutional orthodoxy. I would not today relax the prudential rule to consider the protestants' constitutional challenges to an *unenacted* measure.

## II

## CONSTITUTIONAL ORTHODOXY MAY NOT BE IMPRESSED ON THE POLITICAL PROCESS OF INITIATIVE LAWMAKING

The process of changing statutory law or the state's constitution by initiative petition is a form of lawmaking. Lawmaking is a political process. Judicial pre-enactment scrutiny of proposed legislation for constitutional flaws raises an impermissible restraint on the free exercise of political activity.[11] Unlike *enacted law, lawmaking in progress* need not meet constitutional orthodoxy. Judges serve as stewards of constitutional purity *in law,* but *do not also function as government agents enforcing constitutional conformity upon the political process of lawmaking.* No *official censor's imprimatur*[12] or *nihil obstat*[13] is required for the *content* of a measure to reach the people.[14]

10. *In re Snyder,* 472 U.S. 634, 642–643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1986); *I.N.S. v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *In re Initiative Petition No. 347, supra* note 2, 813 P.2d at 1037 (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.,* Okl., 732 P.2d 466, 467 n. 3 (1987); *Schwartz v. Diehl,* Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety,* Okl., 543 P.2d 563, 564–565 (1975); *see also Davis v. B.F. Goodrich,* Okl., 826 P.2d 587, 593–594 (1992) (Opala, C.J., concurring); *In re Initiative Petition No. 348, supra note 2,* 820 P.2d at 781, 782 n. 4 (Opala, C.J., concurring in result); *Johnson, supra* note 9, 819 P.2d at 708, 712 n. 26 (Opala, C.J., concurring in part and dissenting in part); *State ex rel. Okl. Bar Ass'n v. Lobaugh,* Okl., 781 P.2d 806, 813 (1988) (Opala, J., dissenting); *In re Initiative Petition No. 341, supra* note 2, 796 P.2d at 275 (Opala, V.C.J., concurring in result).

11. *See* Art. 2, § 22, Okl. Const., *supra* note 3.

12. The word *"imprimatur"* means (a) "a license to print or publish," (b) approval of that which is published where censorship of the press exists, (c) "imprint," "sanction, approval," "a sign or mark of approval." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1137 (1961). *Imprimatur* was formerly necessary in England *before* any book could lawfully be printed; in some countries it is still required. BLACK'S LAW DICTIONARY at 681 (5th Ed.1979).

13. The phrase *"nihil obstat"* means "the certification by an official censor of the Roman Catholic Church that a book has been examined and found to contain nothing opposed to faith and morals"; "authoritative or official approval." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1528 (1961).

14. The constitutional provisions governing the initiative and referendum are Art. 5, §§ 1–8, Okl. Const. The terms of § 1 are:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but *the people reserve to themselves the power to propose laws and amendments* to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." (Emphasis added.)

In *Oklahoma Tax Commission v. Smith,* Okl., 610 P.2d 794, 807 (1980), we stated that Art. 5, §§ 1, 2 and 7, Okl. Const., together "comprise an initiative system whereby both the people and the Legislature may propose legislation independently, and neither *can block the effort of the other during the process . . . .*" Our teaching in *Smith*

Public debate on an unenacted measure and the electorate's claim to its adoption is every bit as protected by Art. 2, § 22, Okl. Const.,[15] as is a proposed bill before either of the two legislative chambers. Our fundamental law explicitly proscribes judicial tinkering with the election process. Art. 3, § 5,[16] and Art. 2, § 4, Okl. Const.[17] These constitutional provisions protect both the election and the right of franchise from unauthorized or excessive use of judicial power.[18] There is no reason why the cost of a futile election should be a factor that militates in favor of presubmission constitutional testing of the people's measure. That cost is *never* considered in deciding whether a legislative bill in progress should be enjoined or condemned in chancery.

Only in the clearest case of *firmly settled* and *stable* constitutional jurisprudence that *absolutely* condemns a proposed measure as facially impossible of enforcement, application or execution—and then *only if the protestants have standing to complain* of consti-

tutional infirmity—should this court ever undertake to trump an initiative petition that is on its journey to the ballot box.

## SUMMARY

Because of my continued and unswerving commitment to *Threadgill's* teachings, I would not test for constitutional orthodoxy the content of an initiative petition in advance of its submission and adoption.[19] The electorate's effort at legislating directly should not undergo judicial scrutiny unless the petition is attacked for *noncompliance with some sine qua non requirement for submission.* I would once again counsel the court that its imposition of constitutional orthodoxy on lawmaking process raises an impermissible barrier to lawful efforts at bringing about government reforms. Judges have no power either to *censor* or to *chill* the marketplace debate about competing political ideas.

applies with equal force to bar *judicial* as well as *legislative interference* with initiative process. Courts should be loath to impose judicial restraint on the electorate's power to make law. As the Arizona Supreme Court aptly remarked in *State v. Osborn*, 16 Ariz. 247, 248, 143 P. 117, 118 (1914), to place court-imposed restrictions "would be tantamount to claiming the power of life and death over every initiated measure by the people. It would limit the right of the people to propose only valid laws, whereas the other lawmaking body, the Legislature, would go untrammeled as to the legal soundness of its measures."

15. For the pertinent terms of Art. 2, § 22, Okl. Const., see *supra* note 3.

Our constitution's initiative provisions not only guarantee the right to vote on a proposed measure, they also afford the people a valued opportunity to ventilate—i.e., to air issues in a free political debate. This court has a constitutionally mandated duty to uphold and safeguard free pre-election ventilation of political views. *See In re Initiative Petition No. 314*, Okl., 625 P.2d 595, 613 (1981) (Opala, J., concurring), where I observe that a measure's submission too close to an election would deprive its proponents as well as the contestants of a fundamental right to inform the public about the merits and demerits of the issue before the electorate.

16. The terms of Art. 3, § 5, Okl. Const., are: "All elections shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage, and electors shall, in all cases, except for treason, felony, and breach of the peace, be

privileged from arrest during their attendance on elections and while going to and from the same."

17. The terms of Art. 2, § 4, Okl. Const., are:

"No power, civil or military, *shall ever interfere to prevent the free exercise of the right of suffrage by those entitled to such right.*" (Emphasis added.)

18. The right of a qualified elector to vote and have that vote counted is basic and fundamental. *McCarthy v. Slater*, Okl., 553 P.2d 489, 490 (1976); *Sparks v. State Election Board*, Okl., 392 P.2d 711, syllabus 1 (1964). *See Jackson v. Maley*, Okl., 806 P.2d 610, 623–624 (1991) (Opala, C.J., dissenting).

19. The only options available as a remedy *against invasive initiative power* are (a) to curb—as Justice Mosk suggests—the people's power to create chaos by constitutional amendment defining areas of regulation that lie outside the reserved power of initiative or (b) to act judicially and invalidate an actually *adopted measure when it visits crippling damage to the operations of government by causing institutional paralysis. In re Initiative Petition No. 348*, supra note 2, 820 P.2d at 787 (Opala, C.J., concurring in result). For Justice Mosk's observations about the limits of the electorate's power to legislate by initiative petition, see *Kennedy Wholesale v. Bd. of Equalization*, 53 Cal.3d 245, 279 Cal.Rptr. 325, 332, 806 P.2d 1360, 1367 (1991) (Mosk, J., concurring).

The measure under consideration is fit for submission; I hence concur in the court's disposition of the protest but not in its pronouncement.