2001 OK 98

**In re INITIATIVE PETITION NO. 365,
STATE QUESTION NO. 687.**

**No. 94,155.**

Supreme Court of Oklahoma.

July 2, 2002.

Rehearing Denied Aug. 15, 2002.

D. Kent Meyers, Roger A. Strong, Paige S. Bass, Crowe & Dunlevy, Oklahoma City, OK, attorneys for Opponents Tom Hargus and James T. Tyler.

Larry L. Oliver, Larry L. Oliver & Associates, P.C., Tulsa, Oklahoma, and Lee Slater, Oklahoma City, OK, attorneys for Opponents James Talley, Kelly Barger, Sheryl Maize, George Day, Joseph Clinton Phillips, D.D.S., Mark Kelly, Judy Hamilton, Jeffrey Pearce, Bill McNatt, and Mark Urbanosky and "John Doe."

Marc Edwards, Phillips McFall McCaffrey McVay & Murrah, P.C., attorney for Petitioners.

PER CURIAM.

¶ 1 This is an original action brought pursuant to 34 O.S.Supp.2001, § 8 by Opponents Tom Hargus and James T. Tyler and by Opponents James Talley, Kelly Barger, Sheryl Maize, George Day, Joseph Clinton Phillips, D.D.S., Mark Kelly, Judy Hamilton, Jeffrey Pearce, Bill McNatt, and Mark Urbanosky and "John Doe" challenging the numerical and legal sufficiency of Initiative Petition No. 365, State Question No. 687 that seeks to ban cockfighting in the State of Oklahoma. We hold numerical and legal sufficiency is established and that the petition meets the standards for submission to the people.

¶ 2 Opponents' challenges to the petition fall into two categories, to-wit: challenges to the numerical sufficiency of the signatures and numerous constitutional challenges. Petitioners argue that Opponents fail to meet their burden of clear and convincing proof regarding the invalidity of certain signature challenges and contend that the constitutional challenges lack merit.

## STANDARD OF REVIEW

¶ 3 The proceeding in this Court is authorized by 34 O.S.Supp.2001, § 8, 1992 Okla. Sess.Laws, ch. 92, § 7 and is not appellate in character but constitutes a transference to this Court by the Secretary of State "of all

the papers and documents on file in his office relating to the initiative or referendum petition for an original investigation and hearing *de novo.*" *In re Initiative Petition No. 281, State Question No. 441,* 1967 OK 230, ¶ 5, 434 P.2d 941, 945.

¶ 4 This Court then transferred the matter to Referee Gregory Albert on February 22, 2000 to conduct hearings on the numerical and legal sufficiency of the signatures and to issue a report of his findings of fact and conclusions of law. The hearing commenced on October 2, 2000 and concluded on November 2, 2000. Referee Albert then issued an initial report on November 13, 2000. Petitioners made timely exceptions to this Report, and the Referee issued a Revised Report on November 28, 2000. The Referee's unchallenged findings will be accepted by this Court; we will review *de novo* those findings to which timely exceptions were made.

## SIGNATURE CHALLENGES

¶ 5 When an opponent attacks signatures that appear on an initiative petition on the basis its signers were not registered voters, a presumption arises that the persons are registered voters. The opponent bears the burden of producing sufficient competent evidence to overcome this presumption. *In re Initiative Petition No. 249,* 1950 OK 238, ¶ 0, 222 P.2d 1032 (Syllabus). As we review Opponents' challenges herein, it is important to note that a successful challenge to a signature renders moot another challenge to that signature. *Oklahomans for Alcoholic Beverage Controls, Inc. v. Shelton,* 1972 OK 133, ¶ 15, 501 P.2d 1089, 1092.

¶ 6 Const. Art. 5, § 2 requires that the petition be signed by a number of legal voters equal to at least eight percent (8%) of "the total number of votes cast at the last general election for the State office receiving the highest number of votes at such election." The election to which we look is that of November, 1998, and the number of signatures necessary to place the instant petition before the people is 69,887. The Secretary of State determined the total number of signatures on the petition to be 99,750. Opponents challenge the validity of 54,897 sig-

natures. Successful challenge to 29,864 signatures would render the petition invalid. Opponents set forth the following individual challenges.

## Signatures taken by circulator Robert Godwin: 3,205

¶ 7 Opponents challenge 3,205 signatures taken by a circulator named Robert Godwin, who refused to obey subpoenas and other court orders commanding him to appear. We deny this challenge because the evidence was not critical and it would penalize Petitioners, who are blameless with regard to this circulator's refusal to appear.

## Signatures collected by Don Card: 4,120

¶ 8 Opponents challenge the validity of petitions circulated by Don Card on the basis Mr. Card was not a qualified elector as required in 34 O.S.Supp.2001, § 3.1 and under Oklahoma Constitution Article 3, § 1 that states, "Subject to such exceptions as the Legislature may prescribe, all citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this state, are qualified electors of this state." We note that a circulator is required only to be a "qualified elector," not a registered voter. *Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton,* 1972 OK 133, ¶ 8, 501 P.2d 1089, 1092.

¶ 9 Evidence at the hearing established Mr. Card is a United States citizen over eighteen years of age. However, Opponents presented sufficient evidence at the hearing to support a finding that Mr. Card is not a qualified elector. Therefore, we must disqualify these 4,120 signatures.

## Signatures taken by circulator Billy Calvin: 7,542

¶ 10 Opponents challenge 7,542 signatures gathered by a circulator named Billy Calvin. The evidence at the hearing established Mr. Calvin is a bona fide resident of the State of Oklahoma and is over the age of eighteen. Therefore, Mr. Calvin is a qualified elector and eligible to circulate the petition. As such, we deny this challenge.

**Signatures of persons whose signatures on the petition pre-dated their voter registration dates: 143 net [433 total, 290 previously disqualified because collected by Don Card]**

¶ 11 Opponents challenge these signatures and presented conclusive evidence 143 persons [net] applied for voter registration at the time they signed the petition. Pursuant to 34 O.S.Supp.2001, §§ 3, 6 and 23, only registered voters have the right to sign initiative petitions. Therefore, we must disqualify these 143 *net* signatures.

**Signatures collected by Arling Medina: 3,366**

¶ 12 One of the petition circulators, Mr. Arling Medina, testified that at no time did he appear before a notary public to execute the affidavits attached to the signatures he gathered. He also testified he did not sign such affidavits under oath. His testimony was corroborated by a co-worker who testified that a Ms. Herrian, the circulator in charge who notarized Mr. Medina's signature, came to Mr. Medina's office to gather previously signed pamphlets. Evidence showed that Ms. Herrian's notary logs did not reflect any record of notarization for Mr. Medina. We have held that the failure of an affiant to appear personally before a notary destroys the verification and invalidates the signatures on those sheets. *See, e.g., In re Initiative Petition No. 347*, 1991 OK 55, ¶ 48, 813 P.2d 1019, 1035, [citing *In re Initiative Petition No. 142, State Question No. 205*, 176 Okl. 155, 55 P.2d 455 (1936) and *In re Initiative Petition No. 281, State Question No. 441*, 434 P.2d 941 at pp. 953–956 (Okl.1967)]. Therefore, we must disqualify these 3,366 signatures.

**Signatures involving defects arising from notarization Signatures on petitions where the notaries failed to file proper notary bonds: 1,246**

¶ 13 Before entering upon the duties of the office, a notary must file his or her commission from the Secretary of State and a one thousand dollar ($1,000.00) bond with the court clerk for the county in which the notary resides or is employed. 49 O.S.Supp. 2001, § 2. The circulator's affidavit is required along with a valid notarization pursuant to 34 O.S.Supp.2001, § 6 and 12 O.S.Supp.2001, 432, respectively. We disqualified signatures on pamphlets in which the circulator's verification was before a notary public whose commission had expired in *Oklahomans for Alcoholic Beverage Controls, Inc. v. Shelton*, 1972 OK 133, ¶ 18, 501 P.2d 1089, 1093. The undisputed evidence in the instant case established the notaries on these 1,246 challenged signatures failed to file their bonds. As such, they were without power to perform notarial acts. We must disqualify these 1,246 signatures.

**Signatures challenged for defective notarization: 300**

¶ 14 Opponents challenge 300 signatures for defective notarization. The circulator of the petitions on which these signatures appear, Ms. Inez Blandon, testified she signed her petition affidavits in the presence of Ms. Evalena Herrian, a notary. Ms. Blandon testified at the hearing that she believed Ms. Herrian's husband, Dean Herrian, might have been present when her petition affidavits were notarized. Evidence received during the course of the hearing revealed that, in fact, it was Mr. Herrian, not Mrs. Herrian, who actually notarized Ms. Blandon's affidavits. However, Ms. Blandon's confusion does not impeach her oath as a circulator, wherein she attested to her status as a qualified elector, to the execution of the petition signatures in her presence and to her belief in the correctness of the signers' addresses. *In re Initiative Petition No. 347, State Question No. 639*, 1991 OK 55, ¶ 49, 813 P.2d 1019, 1036. Therefore, we deny this challenge.

**Signatures challenged for illegible notary names on petitions: 153**

¶ 15 Opponents challenge 153 signatures on petitions for illegible notary names. At the hearing, Petitioners elicited testimony that established these notaries were properly qualified. Therefore, we deny this challenge.

**Signatures challenged on the basis the notary public's bond was not filed with the Oklahoma County Court Clerk on the day of notarization: 400**

¶ 16 Opponents challenge 400 signatures on petitions notarized by Ms. Evalena Herrian, contending the affidavits were executed

on September 16, 1999, and Ms. Herrian's notary bond was not filed with the Oklahoma County Court Clerk until September 17, 1999. The record reflects that the Court Clerk's filing stamp on Ms. Herrian's bond form shows a filing date of September 16, 1999, and we regard this as conclusive. Accordingly, we deny this challenge.

**Signatures on petitions unsigned by the circulator or signed by someone other than the circulator named in the heading: 57**

¶ 17 The record established the petitions containing these 57 signatures were not verified on the back by an affidavit signed by the circulator who gathered the signatures on the signature sheet. Some were blank, while others were signed by someone other than the named circulator, all in violation of the requirements of 34 O.S.Supp.2001, § 6. Section 6 requires each sheet of petitions containing signatures to be verified on the back by an affidavit signed by the circulator who gathered them. Therefore, we must disqualify these 57 signatures.

**Forged signatures: 8**

¶ 18 Petitioners' attorneys disclosed at the hearing that eight signatures were forgeries. Evidence confirmed this. Accordingly, we disqualify these 8 signatures.

**Duplicate signatures: 62**

¶ 19 Opponents presented uncontroverted evidence that 62 persons signed the petition more than once. "No legal voter properly can affix his signature to a petition more than one time. When a signature is duplicated, the duplicated signature is to be disregarded." *Oklahomans for Alcoholic Beverage Controls, Inc. v. Shelton,* 1972 OK 133, ¶ 13, 501 P.2d 1089, 1092–1093. Therefore, we disqualify these 62 signatures.

**Signatures of persons identified as "not found" in Opponents' electronic database, consisting of data from the Oklahoma Election Management System: 34,303 *net* (37,146 total; 1,314 collected by Arling Medina and 1,529 collected by Don Card, previously disqualified).**

¶ 20 In this proceeding, as in no other before this court, Opponents were able to compare the names and addresses of those signing the petition against the list of registered voters maintained by the Oklahoma Election Management System (OEMS). The OEMS, enacted in 1990 and codified at 26 O.S.Supp.2001, § 3–101.1 et seq., constitutes a single, computerized official database of registered voters maintained by the State Election Board. Opponents demonstrated at the hearing that they secured the OEMS records for the period during which the petition was circulated. Opponents then converted names and addresses from the OEMS to an electronic database, against which the names and addresses on the petition were compared. Petitioners challenged the validity of the Opponents' database because it did not include certain information contained in the OEMS such as voting history, precinct information, and party affiliation. Petitioners also challenge the accuracy and stringency of Opponents' method of comparison. Finally, Petitioners challenged the authority and admissibility of the OEMS and the Opponent's database.

¶ 21 We uphold the unchallenged finding of the Referee that, besides these presently irrelevant categories (voting history, precinct information, and party affiliation), the Opponents' database otherwise mirrored the records of the OEMS with regard to the listing of registered voters. We also hold that as the official record of voter registration in Oklahoma, the OEMS serves as the authoritative tool for establishing registration and non-registration. Because the OEMS is maintained by the State Election Board, it is an official compilation which carries a presumption of correctness. As we have stated, "in the absence of evidence by the petitioner that the records were incomplete this is a sufficient showing of the correctness of the records, since the presumption is that public officials perform their duty." *In Re Referendum No. 119, State Question No. 381,* 1959 OK 90, ¶ 8, 339 P.2d 530. But, as with any human endeavor, errors may occur in the process of comparing the signers of a petition against the OEMS. This imprecision will be compounded greatly

if a petition's challengers require an overly-stringent match between the petition signer's name or address and the OEMS. We note that challengers to a petition often have strong incentives to require such an exacting match, and the result of these incentives is a difficulty in determining the true registration status of a petition's signers.

■ ¶ 22 We therefore take this opportunity to state explicitly the process used to determine the degree of similarity and accuracy required in comparing a name listed on a petition to the OEMS. A petition's challengers may establish a *prima facie* case of non-registration by proving that a petition signer is not found in the OEMS during the time of the petition's circulation. A challenger's *prima facie* case may be overcome by a petition's proponents. Petitioners may specifically rebut a challenged signature by offering proof that a challenged voter is in fact registered. More broadly, petitioners may defeat a class of challenges by establishing that opponents were generally capricious, unreasonable, or inaccurate in comparing the names or addresses of the petition signers against the OEMS. For example, suppose a petition's opponents challenge a petition signer's registration because the address the signer lists on the petition does not match the address in the OEMS. Just as a voter must rebut an assumption of non-registration caused by a failure to find his or her name or address on the official registration list at a voting booth by presenting adequate documentation of his or her identity and address, Petitioners must rebut opponent's challenge of non-registration by proving that the signer is a registered voter who, for instance, has moved but failed to update his or her address for the OEMS. As we have established, "[t]he need for an address is for verification purposes; if a signer can be located through due diligence, then the address given is sufficient." *In re Initiative Petition 317, State Question No. 556*, 1982 OK 78, ¶ 40, 648 P.2d 1207. Obviously, these categories of rebuttals are not mutually exclusive. If Petitioners overcome a significant number of challenges during the course of a hearing, it could lead us to find that Opponents were on the whole insufficiently fair or careful in their efforts.

¶ 23 Throughout this process a petition's opponents shoulder the ultimate burden of proving non-registration *clearly and convincingly*. "There is no presumption of accuracy as to the check of these records and it is the duty of [Opponents] to offer clear and convincing evidence of nonregistration." *In Re Referendum No. 119, State Question No. 381*, 1959 OK 90, ¶ 9, 339 P.2d 530. Neither the OEMS nor the three-stage test lessens this burden. Rather, the OEMS is an authoritative tool which may be used to establish non-registration, and the burden-shifting framework merely establishes explicitly the process used to evaluate the validity of signatures.

■ ¶ 24 Analyzing the current case under this approach, Opponents challenge 34,-303 net signatures for non-registration because the names and/or addresses were "not found" in the Opponents' copy of the OEMS. "Not found" in this context means that Opponents' checkers found that the first name was not sufficiently similar and/or that the middle initial, last name, or address was not an exact match of a listing in the Opponents' database. Petitioners were unable to reach 4,320 of the challenges, and 12,968 were inadequately rebutted, leaving these 17,288 signatures successfully challenged and thus disallowed. Of the remaining 17,015 signatures, Petitioners specifically rebutted 36 signatures by producing voter registration cards. Further, Petitioners cast doubt on Opponents' system of checking signatures by proving during the constraints of the hearing that 2,681 signatures challenged by Opponents were in fact exact matches of *names and addresses* found in the OEMS. Finally, Petitioners showed that in 14,298 challenged signatures, at least one exact match or substantively similar *name existed* in Petitioners' database. Petitioners' database was also based on the OEMS, but, because it is slightly outdated in some regards and modified in others, is not an official record of the registration list during the time period. Nonetheless, Petitioners' database is a somewhat useful tool to establish registration. While such evidence alone would be insufficient to positively *prove* registration or non-registration, when com-

bined with Petitioners' other successful rebuttals, it causes us to sufficiently doubt the accuracy of these 14,298 challenges such that these challenges lack the necessary clear and convincing proof of non-registration. We must therefore deny these challenges and uphold these signatures as valid.

¶ 25 The number of successful challenges to signatures by Opponents thus stands at 26,290. This number falls short of the 29,864 required to invalidate the initiative petition on the basis of numerical insufficiency. We find 73,460 of the total 99,750 signatures determined by the Secretary of State are valid. As such, we hold that the initiative petition is numerically sufficient to be presented on the ballot for a vote of the people.

## CONSTITUTIONAL CHALLENGES

¶ 26 Generally, we decline to declare an initiative invalid prior to a vote of the people except when there is a 'clear or manifest' showing of unconstitutionality. *See, e.g., In re Initiative Petition No. 362, State Question No. 669*, 1995 OK 77, ¶ 12, 899 P.2d 1145, 1151, citing *In re Initiative Petition No. 358, State Question No. 658*, 1994 OK 27, ¶ 7, 870 P.2d 782, 785. Accordingly, we decline consideration of the issues advanced by Opponents relative to asserted constitutional invalidity of the instant initiative petition.

## CONCLUSION

¶ 27 From examination of all the evidence we conclude the petition is valid in the form required by statutes, that the petition is signed by a sufficient number of legal voters of this state, and that the petition should be submitted to the people for determination. Accordingly, we hold that the initiative petition is legally sufficient numerically and that the ballot title meets the standards for submission to the people.

¶ 28 INITIATIVE PETITION NO. 365 IS DECLARED SUFFICIENT FOR SUBMISSION TO THE VOTE OF THE PEOPLE OF THE STATE OF OKLAHOMA AS STATE QUESTION NO. 687.

¶ 29 HARGRAVE, C.J., WATT, V.C.J., HODGES, LAVENDER, OPALA, KAUGER, BOUDREAU and WINCHESTER, JJ., concur.

¶ 30 SUMMERS, J., not participating.